RENDERED: DECEMBER 19, 2025; 10:00 A.M.
TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2024-CA-0023-MR

COMMONWEALTH OF KENTUCKY        APPELLANT

v.        APPEAL FROM FAYETTE CIRCUIT COURT
HONORABLE JULIE M. GOODMAN, JUDGE
ACTION NO. 21-CR-00336

CORNELL DENMARK THOMAS, II        APPELLEE

OPINION
VACATING AND REMANDING WITH INSTRUCTIONS

** ** ** ** **

BEFORE: THOMPSON, CHIEF JUDGE; ACREE AND A. JONES, JUDGES.

ACREE, JUDGE: The Commonwealth appeals the Fayette Circuit Court's order dismissing the indictment against Cornell Denmark Thomas, II for: (1) lack of evidence; (2) prosecutorial misconduct; and (3) selective prosecution. As explained below, the trial court's order is fraught with legal errors and abuses of both its discretion and its authority, making it necessary that we VACATE the

order, REINSTATE the indictment against Appellee, and REMAND to the Fayette Circuit Court for further proceedings as instructed.

This Opinion would be much shorter had we limited our review merely to reversing the order with conclusory analysis. But the Commonwealth's future appearances before this division of the Fayette Circuit Court are inevitable and uncountable. Not explaining the legal fallacies forming the bases of each of the trial court's errant rulings risks their unnecessary repetition. Unfortunately, the fallacies the trial court embraces are legion.

Additionally, because some errors of law and abuses of discretion impact more than one of the trial court's three grounds for dismissing the indictment, some redundancy is unavoidable.

## I.    FACTS AND PROCEDURAL HISTORY

1. *From the collision to the indictment.*

In Lexington, early on a Friday morning in July 2020, Appellee drove his car into a Leestown Road intersection at 96 miles per hour, ignored a red light, and avoided halted traffic using the left turn lane to go straight. He struck Tammy Botkin's vehicle as she traversed the intersection at 14 miles per hour. Appellee did not apply his brakes. The collision severed Botkin's torso and ejected the upper portion of her body onto the roadway as her vehicle spun into other lanes and caught fire. Appellee left his own disabled vehicle and fled the scene on foot.

We do not know what he saw before absconding or whether it affected him. He was found a few blocks away acting erratically, in mental distress.

Officers thought he was under the influence of drugs or alcohol. In fact, he admitted before his arrest that he ingested both drugs and alcohol the previous night. A blood test detected no alcohol but 5 nanograms of marijuana's effective ingredient (Tetrahydrocannabinol or THC) per milliliter of Appellee's blood serum. (Video Record (VR) 4/21/21; 9:22:20) (Trial Record (TR) 205). Some thought this too little concentration of THC to have affected his behavior.[1]

Subsequent testing for some synthetic drugs was negative, although testimony allowed for the possibility Appellee ingested "something synthetic that we are not able to test" given such drugs' ever-changing nature. (*Id.*).

Eight months later, a grand jury indicted Appellee on one count of wanton murder[2] and one count of leaving the scene of an accident involving a death.[3] The case then underwent delays due to the COVID-19 pandemic.

---

[1] In neighboring jurisdictions this amount exceeds the statutory legal limit. West Virginia sets the *per se* impairment threshold for driving under the influence of marijuana at three (3) nanograms per milliliter of blood serum. W. Va. Code § 16A-5-10(1). Ohio has a threshold of even less, at two (2) nanograms per milliliter of blood serum. Ohio Rev. Code Ann. § 4511.19(A)(1)(j)(vii). Kentucky has no *per se* limit.

[2] Kentucky Revised Statutes (KRS) 507.020(1)(b).

[3] KRS 189.580(1)(a).

2. *Appellee's notice to introduce evidence of his mental health.*

Twenty-three months after his indictment, in accordance with RCr[4] 8.07(2), Appellee gave notice he "intend[ed] to introduce mental health evidence regarding the issues of guilt and punishment," though he was not challenging his competency to stand trial. (TR 117, 119). The Commonwealth timely responded in accordance with RCr 8.07(2)(B) by seeking and obtaining an order that Appellee be psychologically examined. Dr. Timothy Allen performed that examination. Because his report weighed heavily in the dismissal, we examined it closely.

Dr. Allen met with Appellee thirty-three months after his arrest. His interview included "[p]sychological testing . . . that suggested a high probability of having a substance use disorder."[5] The doctor's "Psychiatric Diagnosis" was "Probable Substance-Induced Psychosis, in Remission."

Appellee told Dr. Allen about stressors he experienced during the COVID pandemic prior to his collision with Ms. Botkin's vehicle. "His job was considered essential . . . , he was working regularly and did not miss work" but this also meant "his workload increased." Raising his 11-year-old son through the educational and social challenges brought on by the COVID lockdowns added to his stress. So did his "worr[y] about his mother's ability to maintain her

---

[4] Kentucky Rules of Criminal Procedure.

[5] Quotes here are taken directly from Dr. Allen's report to the trial court unless noted otherwise.

employment" and similar worry "about [his girlfriend's] employment through COVID." Learning his girlfriend was pregnant and "the potential financial requirement of raising another child" further contributed to his stress. Then, "she suffered a miscarriage." Appellee reported he was bearing all "these numerous stressors" before the collision. He then added he was also stressed by disagreements with co-workers regarding the George Floyd incident.

Appellee reported to Dr. Allen his best recollection that, on the day previous to the collision, he ended work around 5:00 PM, had dinner with his son, and likely did what had become "his routine to smoke a joint of marijuana and drink a single beer[.]" However, Dr. Allen concluded, "His psychological testing revealed substance abuse to be a likely problem, probably more than the regular use of a single joint and single can of beer he reported in his interview."

He reported that, before the accident, "he was not sleeping well due to his anxiety over the stressors described above." He said his son and girlfriend both told him he left home after midnight on the morning of the collision and went to his girlfriend's house. There, he made "statements of religious importance . . . that [his girlfriend] did not understand." He recalled her telling him she needed to be at work by 6:00 AM, but he does not remember why he left her place that morning. He did not say whether he slept at all that night.

Dr. Allen reached a conclusion that Appellee "displayed psychotic thought process *at the time of his arrest* on July 3, 2020." (Emphasis added). The doctor addressed RCr 8.07(2)(C), specifically, which does not call for a diagnosis of sanity or insanity. That rule merely requires a professional assessment whether a criminal defendant "has suffered[] from a mental disease or defect or any other mental condition of the defendant that bears on . . . guilt . . . , punishment; or" both. RCr 8.07(2)(C). Dr. Allen opined that mental disease or defect affected Appellee. However, he did not opine—nor was it his role rather than that of the jury—whether, at the time of the collision, Appellee "lack[ed] substantial capacity either to appreciate the criminality of his conduct or to conform his conduct to the requirements of law." KRS[6] 504.020(1). Dr. Allen expressly, and correctly, stated, "What weight, if any, this information [regarding his mental disease or defect] has upon [Appellee's] proceedings will be deferred to the trier-of-fact"— *i.e.*, the jury. Finally, the doctor concluded that if Appellee was experiencing this mental illness in the form of "an episode of psychosis at the time of the accident," it was "most likely substance induced."[7]

---

[6] Kentucky Revised Statutes.

[7] Appellee never had a psychotic episode prior to the accident and has not had one since.

3. *Appellee moves to dismiss the indictment for one reason—lack of evidence.*

After Dr. Allen submitted his report, Appellee moved to dismiss the indictment. He argued Dr. Allen's report showed he experienced a psychotic episode when the accident occurred, and the Commonwealth did not dispute it. Therefore, he posited that the Commonwealth could not prove he was legally sane when he struck Ms. Botkin—that is, he argued it was irrefutable that he lacked the mental capacity required to hold him legally responsible. The Commonwealth objected to the propriety of such a motion, as well as to its substance, but the trial court scheduled a hearing anyway.

Before taking testimony, the trial court, having read Dr. Allen's report, told the Commonwealth, "[T]here's a difference between criminal acts and tragic accidents" and expressed doubt "that there was a criminal act here." (VR 5/8/23; 10:06:05). The trial court went on to predict that, one day in the future, the Commonwealth would say it "'didn't even have any evidence to really begin with to prosecute someone criminally.'" (*Id.*).

The Commonwealth's brief expresses concern that these comments indicate the trial court had already decided to dismiss the case. Although we find the Commonwealth's concern reasonable based on the record, the trial court did hear testimony and, in part, based its order dismissing on that testimony.

Dr. Allen testified consistently with his report. He informed the court he had since been made aware of the second blood test but still believed an intoxicating substance was the likely cause of the episode given the "exceedingly rare" occurrence of such episodes resulting only from pre-accident stressors such as Appellee identified. Dr. Allen indicated that when a person has a psychotic break of short duration with no prior or subsequent history of such mental illness, as in this case, the psychotic episode is most likely brought on by drug use. Dr. Allen also testified, however, that it was not completely beyond the realm of possibility that Appellee had a one-time, short psychotic break caused by stressors other than drugs or alcohol.

4. *Trial court dismisses for lack of substantial evidence.*

Appellee made one argument—there is not enough evidence to prove he was sane when he entered the intersection and struck Ms. Botkin's vehicle or when he fled the scene. The trial court presumed pre-trial authority to assess the sufficiency of evidence of a defendant's sanity at the time of a crime's commission and did so, notwithstanding Dr. Allen's legally accurate admonition that the weight to be given such evidence as his report should be left to the trier of fact.

Despite the absence of proof Appellee ever contracted COVID, the trial court cited "a growing body of evidence linking short-duration acute psychotic episodes with COVID-19 infections[.]" (TR 210 n.1). Neither Appellee nor the

-8-

Commonwealth presented that evidence. Nevertheless, the trial court concluded Appellee lacked *mens rea* when he entered the intersection and then fled. It concluded the only way Appellee could still be found guilty was if he brought on his own temporary insanity by voluntary intoxication. *See* KRS 501.020, 501.080.

The trial court then weighed the Commonwealth's evidence of voluntary intoxication and found it lacking. The trial court held as a matter of law that Appellee's "insanity" (defined in KRS 504.060(7)) eliminated the possibility he had the requisite mental state to be found guilty. Said the trial court, "all the available evidence supports dismissing the indictment because [Appellee] is not mentally culpable[.]" (TR 225). The trial court did not stop there.

After looking behind the facially valid indictment and independently gathering more extrajudicial evidence relating to issues neither party raised, the court opined that there were two other grounds justifying the indictment's dismissal—prosecutorial misconduct and selective prosecution.

5. *Trial court* sua sponte *dismisses indictment for prosecutorial misconduct.*

Appellee alleged no pre- or post-indictment impropriety by the prosecutor. Nevertheless, the trial court took it upon itself to look behind the indictment to critique the Commonwealth's performance before the grand jury and to assess the evidence presented there. The trial court disclosed in its order the

-9-

grand jury testimony of a witness (Sergeant James Boyd) and the statements, testimonial in nature, of "[t]wo different grand jurors[.]" (TR 205–07, 224).

The court was troubled by what it deemed the presentation of inconsistent police testimony to the grand jury.[8] It faulted the prosecutor for not clarifying that testimony and for failing to present exculpatory evidence. (*Id.*).

The trial court also was displeased with the Commonwealth's post-indictment conduct. Specifically, the court criticized the Commonwealth's Attorney for not informing Dr. Allen or the trial court sooner regarding the second blood test. It was also displeased with Dr. Allen for not revising his report once he was informed of the second blood test and before he testified.

The trial court found "no one specific action of the Commonwealth[']s Attorney's office, taken by itself, is prejudicial enough to warrant dismissal of the indictment[,]" (TR 224), but said "[t]he Commonwealth's failure to correct the report—which has misled this Court and would have

---

[8] The trial court took issue with police testimony that Appellee "*intentionally*" avoided vehicles stopped at the red light, deeming it improper for the officer to presume "a conscious choice." (TR 224). The court focused on Appellee's state of mind rather than the unrefuted fact he used the dedicated turn lane to go straight through a red light at 96 miles per hour. Stunningly, the trial court also said other evidence about the confusing nature of the intersection that could have been presented to the grand jury, but wasn't, would have provided "a far more innocent explanation for [Appellee's] presence in the left lane." (TR 207). Ironically, because the trial court learned about this "confusing intersection" by listening to the grand jurors' statements, it can hardly be true that the information was withheld from the grand jury. At least two jurors possessed the evidence and spoke up about it during the grand jury proceedings.

potentially misled the jury—is evidence of prosecutorial misconduct." (TR 225). The trial court concluded that "the Commonwealth's decision to proceed . . . is enough when combined with evidence of its failure to give the grand jury, Dr. Allen, and the Court all of the relevant evidence" to justify dismissing the indictment. (TR 224).

6. *Trial court* sua sponte *dismisses indictment for selective prosecution.*

The trial court pursued a second *sua sponte* basis for dismissal—selective prosecution. It suspected the prosecutor of singling out Appellee, an African American, for prosecution based on his race. The trial court referenced a single separate criminal case over which it presided involving a Caucasian man who ran a red light while intoxicated, killing his passenger. Focusing on race over all other distinguishing factors, the trial court was troubled that, although the white defendant was prosecuted, he was charged with a lesser crime than Appellee. The court offered the Commonwealth no meaningful opportunity to bring non-race-based distinctions to its attention.

The trial court also based its selective-prosecution ruling on its personal knowledge of "statistics collected by the Department of Public Advocacy ('DPA') and published by the Fayette County Commission for Racial Justice and

-11-

Equality," (TR 212), indicating African Americans were charged more harshly than Caucasian defendants.[9]  Neither party introduced this documentary evidence.

The final bit of "proof" was the trial court's opinion, based on "its 15-year tenure on the bench," that there is "a clear pattern of disparate charging decisions by the Commonwealth in which white defendants are charged with lesser offenses and given better offers than defendants of color."  (TR 223).  However, no evidence in the record supports that view other than the trial court's attestation.[10]

Summarizing the order the Commonwealth presents for review, the trial court dismissed the indictment for three reasons—lack of evidence, prosecutorial misconduct, and selective prosecution.  We must review all three

---

[9] Despite a superscript "5" appearing at the end of the sentence describing these statistics in the body of the order, there is no corresponding footnote at the bottom of the page citing the statistics' source or its place in the record.

[10] Curious whether the records of this Court of Appeals would support such an allegation, we surveyed our opinions, and those of the Supreme Court, going back more than twenty (20) years. In that period, Fayette County prosecutors brought criminal cases before all five (5) divisions of Fayette District Court and all five (5) divisions of Fayette Circuit Court.  Our survey shows those courts addressed only three allegations of selective prosecution and every court involved in all three cases concluded there was no merit to any allegation of selective prosecution.  *Ibarra Miranda v. Commonwealth*, No. 2004-CA-000365-MR, 2005 WL 791176 (Ky. App. Apr. 8, 2005) (Noble, J.) (Insufficient evidence to create a prima facie case of racial profiling); *Holsey v. Commonwealth*, No. 2003-CA-000018-MR, 2004 WL 2914750 (Ky. App. Dec. 17, 2004) (Overstreet, J.) (Appellant claimed trial counsel was ineffective for failing to seek an evidentiary hearing on the issue of selective prosecution.  Court of Appeals held there was no legitimate claim of selective prosecution; evidence against Appellant was greater than the evidence against the two white similarly situated individuals.); *Dees v. Commonwealth*, No. 2003-CA-001737, 2004 WL 2567152 (Ky. App. Apr. 13, 2004) (Overstreet, J.) (Appellant claimed trial counsel was ineffective for failing to challenge the stop and search based on racial profiling.  Applying *United States v. Armstrong*, 517 U.S. 456, 116 S. Ct. 1480, 134 L. Ed. 2d 687 (1996), Court found insufficient evidence of discriminatory effect or discriminatory purpose.).

bases for dismissal because we are expected to "affirm on any grounds supported by the record." *Southern Fin. Life Ins. Co. v. Combs*, 413 S.W.3d 921, 926 (Ky. 2013). We conclude the order cannot be affirmed on any ground.

## II. STANDARD OF REVIEW

When a trial court is authorized to make unmixed findings of fact, we review for clear error. Kentucky Rule of Civil Procedure (CR) 52.01; *McQueen v. Commonwealth*, 721 S.W.2d 694, 698 (Ky. 1986). Clear error exists if the finding is not supported by substantial evidence. *Moore v. Asente*, 110 S.W.3d 336, 354 (Ky. 2003) (citation omitted).

When a trial court is not authorized to make findings of fact, the factfinding itself is clear error. *See Davidson v. Commonwealth*, 47 S.W. 213, 213 (Ky. 1898) ("jury being the judges of the questions of fact under proper instructions, we have no authority to interfere"); *Taylor v. Commonwealth*, 671 S.W.3d 36, 44, 45 (Ky. 2023) ("jury's authority to determine the facts").

When a trial court dismisses an indictment, we review the court's application of the law to the facts *de novo*. *Commonwealth v. Fillhardt*, 652 S.W.3d 213, 216 (Ky. App. 2022). To the extent a trial court's order or judgment is based on the exercise of discretion in applying its supervisory powers, we review that exercise for abuse. *Commonwealth v. Grider*, 390 S.W.3d 803, 817 (Ky. App. 2012). Thus, we must determine whether the trial court's use and exercise of its

-13-

supervisory powers was arbitrary, unreasonable, or unsupported by sound legal principles. *Commonwealth v. English*, 993 S.W.2d 941 (Ky. 1999).

The abuse of discretion standard is often an indulgent one considering the finality doctrine and similar considerations, with abuses sometimes forgiven as harmless errors. *Standards of Review: Judicial Review of Discretionary Decisionmaking*, 2 J. APP. PRAC. & PROCESS 47, 47–48 (2000) (Discretion is "the power . . . of the tribunal below, measured by the hesitation of the appellate court to overturn the lower court's decision."). As much as this standard varies from jurisdiction to jurisdiction, each version has its limits. As stated by a foremost scholar on the abuse-of-discretion standard:

> There are a half dozen different definitions of "abuse of discretion," ranging from ones that would require the appellate court to come close to finding that the trial court had taken leave of its senses to others which differ from the definition of error by only the slightest nuance, with numerous variations between the extremes.

Henry J. Friendly, *Indiscretion About Discretion,* 31 EMORY L.J. 747, 763 (1982). We need not determine the precise limit of Kentucky's abuse-of-discretion standard, but we are certain it does not extend to Judge Friendly's taking-leave-of-one's-senses extreme.

## III.   ANALYSIS

We agree with the Commonwealth that none of the trial court's stated grounds for dismissing the indictment can be affirmed because each one is based

-14-

upon legal errors, discretionary abuses, and excesses of the court's authority. The record leads us to believe the source of these aberrations from the law is a basic misapprehension of a trial judge's role in the justice system, revealed first in the trial court's interference with the independent grand jury process.

A grand jury has investigatory powers. *Stengel v. Ky. Bar Ass'n*, 162 S.W.3d 914, 919 (Ky. 2005) ("Grand Jury is 'an investigative body'"). The Commonwealth's Attorney has prosecutorial powers. *Flynt v. Commonwealth,* 105 S.W.3d 415, 424 (Ky. 2003). When the criminal defendant does not waive jury trial, the petit jury possesses all factfinding powers relating to all matters of the defendant's guilt or innocence. *Gray v. Stewart*, 658 S.W.3d 1, 21 (Ky. 2022). In such a case, a trial court has no authority to exercise any of these powers. This trial court improperly exercised them all.

"[D]ismissal of an indictment is 'an extreme sanction that should be infrequently utilized.'" *Commonwealth v. Baker*, 11 S.W.3d 585, 590 (Ky. App. 2000) (quoting *United States v. DiBernardo*, 775 F.2d 1470, 1475 (11th Cir. 1985) (quoting *United States v. Pabian*, 704 F.2d 1533, 1536 (11th Cir. 1983))). Our analysis reveals the trial court incautiously failed to stay in its lane, so to speak, and improperly invaded the separate provinces of an independent grand jury, the Executive Branch prosecutor, and the petit jury the trial court had not yet seated.

**A. Dismissal for Lack of Evidence Was Based on Reversible Errors.**

"The grand jury . . . investigate[s] allegations of criminal conduct and determine[s] if there is probable cause to believe that a crime has been committed [and] . . . protect[s] the public against unfounded criminal prosecutions where probable cause is lacking." *Fletcher v. Graham*, 192 S.W.3d 350, 363 (Ky. 2006). Once the grand jury finds probable cause and issues the indictment, the Commonwealth must prosecute because "the indictment is a charge by the grand jury, not the prosecutor." *Hoskins v. Maricle*, 150 S.W.3d 1, 17 (Ky. 2004) (citing *Commonwealth v. Vanmeter*, 8 Ky. Op. 754, 755, 1876 WL 12677, at *1 (1876)).

A trial court must allow the Commonwealth to present evidence against the defendant regardless of the trial court's own opinion as to the strength of its case or that of the defendant. *Barth v. Commonwealth*, 80 S.W.3d 390, 404 (Ky. 2001) ("Commonwealth is entitled to present its evidence to a jury before a trial court can dismiss a charge by directed verdict of acquittal."). As our Supreme Court said in *Commonwealth v. Young*: "The general rule is that '[a]n indictment returned by a legally constituted and unbiased grand jury . . . if valid on its face, is enough to call for trial of the charge on the merits.'" 487 S.W.3d 430, 437 (Ky. 2016) (quoting *Costello v. United States*, 350 U.S. 359, 363, 76 S. Ct. 406, 100 L. Ed. 397 (1956)).

There is no challenge to or question of the indictment's validity. Nevertheless, the trial court entertained Appellee's motion to dismiss on grounds of Appellee's insanity at the time of the accident and conducted a hearing.

Just before hearing testimony, the trial court put upon the Commonwealth the burden of disproving Appellee's contention, asking: "[W]here is the Commonwealth meeting . . . its burden to establish that there was a wanton act that created this tragic accident?" (VR 5/8/23; 10:06:05). Of course, the trial court was aware Appellee violated several traffic laws in extreme ways that posed "a substantial and unjustifiable risk" to others. KRS 501.020(3). But the court reduced the statute to focus solely on the qualifier to wantonness—that Appellee must be "aware of and consciously disregard[ed]" that risk—and demanded the Commonwealth's proof. *Id.* Unfortunately for all involved, the trial court does not understand the burden is on the defendant to prove his disqualifying mental state. It is not the prosecutor's burden to prove he was sane. That led to a host of errors.

1. *Trial court entertained improper motion to dismiss for lack of proof.*

In *McCue v. Commonwealth*, as in this case, the defendant moved to dismiss the indictment before trial. 652 S.W.3d 218, 220 (Ky. App. 2022). He argued the evidence before the grand jury was neither enough to support probable cause nor to sustain the prosecutor's case at trial. "In effect," McCue's motion, like Appellee's, "was a motion for summary judgment, 'and the rule in Kentucky

has long been that summary judgment does not exist in criminal cases.'" *Id.* at 222 (quoting *Barth*, 80 S.W.3d at 404 (citing *Commonwealth v. Hayden*, 489 S.W.2d 513, 516 (Ky. 1972))).[11]

We said in *McCue*, "Such a pre-trial motion . . . *improperly* asks the trial court to weigh evidence." *Id.* (emphasis added). Apparently, we were not sufficiently clear regarding the impropriety of pre-trial motions to dismiss a criminal indictment whether for lack of probable cause or lack of proof to persuade a petit jury of the defendant's guilt. But we do note saying, "the motion the trial court entertained and the proceeding to decide it are plainly at odds with both the Kentucky Rules of Criminal Procedure and Kentucky jurisprudence." *Id.* at 221.

And we also said, "a pre-trial summary disposition motion [is] contrary to [*Commonwealth v.*] *Isham*[, 98 S.W.3d 59 (Ky. 2003)] and its progeny." *Id.* at 223. As our Supreme Court made clear, "It is premature for the trial court to weigh the evidence prior to trial to determine if the Commonwealth

---

[11] Even if the summary judgment standard were a permissible measure, genuine issues of material fact do exist regarding Appellee's mental state. Appellee's compliance with RCr 8.07(2) notified the trial court of his intent to attempt satisfaction of his burden *of production* by presenting "mental health evidence regarding issues of guilt and punishment[.]" That procedural rule facilitates the notice requirement of KRS 504.070 which presumes the possibility a defendant might present enough evidence to create a jury question regarding his insanity and justify a jury instruction. Defendant's mental illness or insanity remains a genuine issue "at trial" where only the jury is authorized to decide whether the defendant's production of such evidence also satisfies its burden *of proof* as we discuss below. *See Coffey v. Messer*, 945 S.W.2d 944, 945 (Ky. 1997).

can or will meet [its] burden. . . . [and] it [i]s not the province of a trial judge to evaluate evidence in advance in order to decide whether a trial should be held. . . . [T]he proper time for such an evaluation is upon motion for a directed verdict." *Isham*, 98 S.W.3d at 62 (internal quotation marks and citations omitted). This is true even if the trial court believes *before* trial there is less than a scintilla of evidence to support the Commonwealth's burden of production. *Biederman v. Commonwealth*, 434 S.W.3d 40, 47–48 (Ky. 2014) (scintilla of evidence not enough to survive directed verdict).

Wrapping up in *McCue*, we said, "Summary dismissal before trial without the Commonwealth's consent based on a lack of probable cause was never an option." *Id.* at 224. Nor was it here. Asking the court to weigh the evidence presented to the grand jury is improper. As the Supreme Court of the United States pointedly said, "'[A] challenge to the reliability or competence of the evidence presented to the grand jury' will not be heard." *United States v. Williams*, 504 U.S. 36, 54, 112 S. Ct. 1735, 1746, 118 L. Ed. 2d 352 (1992) (quoting *Bank of Nova Scotia v. United States*, 487 U.S. 250, 261, 108 S. Ct. 2369, 2377, 101 L. Ed. 2d 228 (1988)). The trial court's first legal error was entertaining the motion at all.

2. *RCr 8.16 does not authorize motion to dismiss an indictment.*

A hallmark of the trial court's adjudication is finding authority where none exists. The first example is its ruling that RCr 8.16 authorizes dismissal of

the indictment at the pre-trial stage. After acknowledging no Kentucky authority ever said so, (TR 215), the trial court turned to federal jurisprudence, then misinterpreted it.

Citing *United States v. Craft*, 105 F.3d 1123 (6th Cir. 1997), the court claimed the Sixth Circuit "explicitly ruled that such motions [as Appellee's] are appropriate under Federal Rule of Criminal Procedure 12(b)(1)—the federal counterpart to RCr 8.16, which uses nearly identical language."[12] (TR 215 (citing *Craft*, 105 F.3d at 1126)). Using the phrase "such motions," the trial court erroneously equated Appellee's motion with what occurred in *Craft*. Failing to recognize the motions' distinctions from one another, the trial court misinterpreted *Craft* and misapplied it to this case.

The major distinction is that the defendant in *Craft* sought *preliminary* factfinding from the district court while Appellee sought *substantive* factfinding from this trial court. The federal rule authorized the defendant to move the district court for preliminary factfinding that resolved his case on procedural grounds. That could be done "without a trial on the merits." Fed. R. Crim. P. 12(b). That is quite different from Appellee's motion seeking substantive factfinding on an

---

[12] The version of Fed. R. Crim. P. 12(b) cited in *Craft* stated: "A party may raise by pretrial motion any defense, objection, or request that the court can determine without a trial on the merits." Kentucky's RCr 8.16 states: "A party may raise by pretrial motion any defense, objection, or request that the court can determine without a trial of the general issue."

incomplete record and a determination that no reasonable petit juror would convict him.  Such factfinding may only be performed by a jury in "a trial of the general issue[,]" RCr 8.16, and only "under the evidence as a whole . . . ." *Port v. Commonwealth*, 906 S.W.2d 327, 330 (Ky. 1995) (citation omitted).

The trial court failed to discern any distinction between preliminary facts and substantive facts.  Three characteristics differentiate them.

First, preliminary facts bear on issues of due process protections such as "former jeopardy, former conviction, former acquittal, statute of limitations, immunity [and] lack of jurisdiction."  *Craft*, 105 F.3d at 1126 (quoting *United States v. Smith*, 866 F.2d 1092, 1096 n.3 (9th Cir. 1989)).  We so venerate these protections and guarantees of our justice system that if they are violated, the defendant's guilt or innocence becomes irrelevant and, therefore, a petit jury's substantive factfinding becomes unnecessary.

Second, preliminary facts tend to be apparent from the record or are readily ascertainable, such as when they "are stated in the indictment . . . [or] are essentially undisputed[.]"  *Id.* at 1127.

Third, the determination of a preliminary fact, either for or against the defendant, will not make his guilt or innocence more or less likely.  "[P]reliminary facts [are] easily isolated from the issues on the merits."  *Id.*  Therefore, a judge

who restricts herself to finding facts with these attributes will not be invading the province of the petit jury.

Substantive facts on the other hand bear directly on a criminal defendant's guilt or innocence. Unless a jury trial is waived, such facts must be determined by the defendant's peers who have sworn an oath—the petit jurors. Misinterpreting *Craft* led the trial court to find Appellee's insanity to be a fact— substantive factfinding reserved solely and solemnly to the petit jury.

Had the trial court read *Craft* in its entirety, it could have avoided the obvious misinterpretation. The district court in *Craft* dismissed an indictment on statute of limitations grounds and the government appealed. Hoping the appellate court would reverse, the Government cited *Costello*, *supra*, "plac[ing] its reliance on this general language: 'An indictment returned by a legally constituted and unbiased grand jury . . . if valid on its face, is enough to call for trial of the charge on the merits." *Craft*, 105 F.3d at 1126 (quoting *Costello*, 350 U.S. at 363, 76 S. Ct. at 409) (internal quotation marks omitted). That had frequently been a winning argument when a trial court's pre-trial *substantive* factfinding was the issue on appeal. It was not a winning argument in *Craft* which made clear that some determinative post-indictment/pre-trial due process conclusions can be reached when the court limits itself to determining only *preliminary facts*.

The *Craft* court said: "Courts usually say that a motion to dismiss is 'capable of determination' before trial if it involves questions of law instead of questions of fact on the merits of criminal liability" and "courts may ordinarily make *preliminary findings of fact* necessary to decide questions of law presented by pretrial motions so long as the trial court's conclusions do not invade the province of the ultimate factfinder." *Id.* (emphasis added).

In the case *sub judice*, the trial court seized on this language and concluded it was only engaging in preliminary factfinding when it assessed the weight of Dr. Baker's report and testimony. It then declared the substantive factual question of Appellee's sanity when he entered the intersection to merely involve "a purely legal issue" for the court to decide. (TR 221).

The kind of factfinding Appellee asked the trial court to undertake— the finding he was insane—unquestionably is not what *Craft* allowed. Such a substantive fact as a defendant's insanity is far different than "facts relating to the disposition of the statute of limitations issue [which] are stated in the indictment or constitute preliminary facts easily *isolated from the issues* on the merits. These facts are essentially undisputed and raise a legal issue, not a factual one." *Id.* at 1127 (emphasis added).

The Sixth Circuit expressly distinguished this kind of nearly self-evident preliminary factfinding from improper pre-trial motions like Appellee's

that "challenge . . . the adequacy of the evidence before the grand jury." *Id.* The

hearing our trial court conducted preceding its factfinding and dismissal of the

indictment is precisely what *Craft* was talking about when it said:

> criminal cases generally should not be attenuated by
> preliminary or 'mini-' trials concerning the adequacy of
> the grand jury proceedings or the competency of the
> evidence presented to the grand jury. *Cf. United States v.
> Short*, 671 F.2d 178, 181–82 (6th Cir.1982) (reversing . . .
> finding district court may not test government's evidence
> pretrial).

*Id.*

When read in full, *Craft* provides no basis for this trial court's

position that it was not invading the province of the jury by measuring the

evidence of Appellee's insanity—a question clearly bearing on Appellee's guilt or

innocence. To the contrary, *Craft* rejects as improper exactly what this trial court

did. Substantive factfinding by the court is just as prohibited in the federal system

under Fed. R. Crim. P. 12(b)(1) as it is in Kentucky under RCr 8.16. *Craft*, 105

F.3d at 1127 (disapproves motion testing "the competency of the evidence

presented to the grand jury"). The trial court committed legal error by misapplying

RCr 8.16 to dismiss the indictment.

3. *Trial court's factfinding commandeered the criminal justice system.*

*McCue*, *supra*, suggested "entertaining the motion [to dismiss the

valid indictment before trial] is just a waste of judicial resources" and found it

harmless error. *McCue*, 652 S.W.3d at 222. That was because the circuit court denied the motion. But the Fayette Circuit Court here granted the improper motion, delaying justice for Appellee and the Commonwealth by commandeering the intentional system of justice our federal and state constitutions designed.

To wit, our General Assembly is the representative voice of all Kentucky citizens, looking to the future to decide what laws should govern them. A grand jury is a representative body of the same citizens who decide in the present whether a sufficient probability exists that a fellow citizen's conduct breached their laws. A third representative body—a petit jury—decides whether a defendant's conduct in the past is sufficiently repugnant to the community's expectations as expressed by those laws that he should be found guilty and held to account. Each body is an explicit creation and guaranteed protection of our Constitution.[13] KY. CONST. §§ 7, 11, 12, 29 *et seq.*, and 248. Each is part of our system of justice.

---

[13] The grand jury indictment process and trial by jury are protections constitutionally guaranteed to every criminal defendant. Only the defendant can eliminate the representative roles these bodies play in our system by knowingly, voluntarily, and intelligently waiving their protections. *Malone v. Commonwealth*, 30 S.W.3d 180, 182, 183 (Ky. 2000) ("Among the rights specifically protected in Kentucky's Constitution is not only the right to have a grand jury indictment as a prerequisite to a felony prosecution, but also the right to a jury trial. . . . The right to waive a particular form, mode, or kind of accusation in a particular instance is an individual right of the accused. It is a personal privilege that may be waived.").

A trial court's function is to shepherd that representative process, not commandeer it. An improper motion such as Appellee's provides an incautious judge an opportunity to do what is prohibited. A trial judge who disregards the limits of her authority risks succumbing to a temptation, or a party's improper motion, to interlope among the grand jurors who did decide to indict or even among the petit jurors who would decide the ultimate question—whether a properly indicted defendant is guilty or not.

In the instant case, testimony and other evidence received at a limited evidentiary hearing, combined with the trial court's personal experiences and research, and its prior unhappiness with prosecutor conduct, led this trial court to create nine (9) pages of substantive "Findings of Fact," (TR 204–13), and to decide Appellee's case on its merits. In doing so, the trial court ignored the interplay of these carefully crafted checks and balances, exalting its own role above the others.

4. *Trial court's dismissal violates the separation-of-powers doctrine vis-à-vis the grand jury.*

"[T]he grand jury is an agency of neither the court nor the prosecutor, but an independent agency of constitutional origin . . . ." *Hoskins*, 150 S.W.3d at 18; *Democratic Party of Ky. v. Graham*, 976 S.W.2d 423, 427 (Ky. 1998) ("[T]he grand jury is an institution of constitutional origin in Kentucky."). "The indictment is an accusation made in behalf of the people. It is formed by the concurrence of nine or more grand jurors (CONST. § 248) in proper session and is

-26-

completed by a return or delivery to the court." *Nicholas v. Thomas*, 382 S.W.2d 871, 872 (Ky. 1964). While the grand jury is in proper session and until an indictment issues, the trial court has yet to obtain jurisdiction of the case, and its role is circumscribed by RCr 5.02 to RCr 5.24. *Commonwealth v. Adkins*, 29 S.W.3d 793, 796 (Ky. 2000) ("Circuit Court initially obtained jurisdiction when Appellee was indicted on a felony charge."). *See Williams*, 504 U.S. at 46–48, 112 S. Ct. at 1741–42 (citations omitted) (referencing Fed. R. Crim. P. 6, the federal corollary to RCr 5.02 *et seq.*, Court held trial court's authority over a grand jury is limited to these "few, clear rules which were carefully drafted and approved by this Court and by Congress to ensure the integrity of the grand jury's functions"). Some of those limited powers survive once the trial court obtains jurisdiction to adjudicate the indictment. *See, e.g.*, RCr 5.24(3).

Once a grand jury issues a facially valid indictment based on its conclusion that a putative criminal defendant likely violated a law, the separation-of-powers doctrine prohibits unilateral action by either an Executive Branch prosecutor or a Judicial Branch judge to undo its work. *Hoskins*, 150 S.W.3d at 18; RCr 9.64; RCr 6.16; RCr 5.10; RCr 5.16. *See also Keeling v. Commonwealth*, 381 S.W.3d 248, 255 (Ky. 2012) (citing *Flynt*, 105 S.W.3d at 424) (A trial court is prohibited even from "permit[ting] a defendant to participate in a pretrial diversion program over the Commonwealth's objection[.]").

-27-

The grand jury's status as an independent functionary, however, does not mean its power to indict is immune from challenge. As part of the checks and balances employed by our Constitution in separating powers among the branches of government, amendment or dismissal of a grand jury's indictment is possible, but *only* by the concerted action of both the Executive Branch prosecutor and the Judicial Branch judge. *See Hoskins*, 150 S.W.3d at 18; RCr 9.64; RCr 6.16. That process survived constitutional scrutiny, and our Supreme Court endorsed it. *Id.*

The trial court's error here was constitutional in that it ignored the separation-of-powers prohibitions and infringed upon the separate powers of the grand jury. KY. CONST. § 248. In a separate section below, we address the trial court's breach of the separate powers allocated to the Executive Branch prosecutor.

5. *Trial court erred by shifting burden of proving sanity to Commonwealth.*

Even if we had found the motion to dismiss proper, and even if the trial court had the unilateral power to grant the motion, we would still reverse for yet another legal error. The trial court improperly placed the burden of proving Appellee's mental state upon the Commonwealth.

In substance, Appellee and the trial court take the same position argued in *McDonald v. Commonwealth* where the defendant posited that "the mental condition of the appellant is an integral part of the crime and must be proven [by the Commonwealth] the same as any other element of the offense."

554 S.W.2d 84, 85 (Ky. 1977). Our Supreme Court rejected that argument. *Id*. at 86 (citing *Patterson v. State of New York*, 432 U.S. 197, 97 S. Ct. 2319, 52 L. Ed. 2d 281 (1977); KRS 500.070; KRS 504.020). *See also Furnish v. Commonwealth*, 95 S.W.3d 34, 41 (Ky. 2002) (denial of motion to dismiss for failure of the indictment "to state the culpable *mens rea* for the charges").

More recently, SCOTUS again explained what should be obvious to every jurist—a defendant's sanity need not be proved by the prosecutor because the sanity of every citizen, specifically including criminal defendants, is *presumed*.

> The presumption of sanity is . . . universal in some variety or other, being (at least) a presumption that a defendant has the capacity to form the *mens rea* necessary for a verdict of guilt and the consequent criminal responsibility. . . . This presumption dispenses with a requirement on the government's part to include as an element of every criminal charge an allegation that the defendant had such a capacity.

*Clark v. Arizona*, 548 U.S. 735, 766–67, 126 S. Ct. 2709, 2729–30, 165 L. Ed. 2d 842 (2006) (citations omitted).

It is somewhat astounding that a Kentucky judge would be unaware of a legal concept so universally known. "In all English-speaking courts, the accused is obliged to introduce proof if he would overcome the presumption of sanity." *Leland v. State of Or.*, 343 U.S. 790, 799, 72 S. Ct. 1002, 1008, 96 L. Ed. 1302 (1952). Kentucky is one such English-speaking jurisdiction where "[n]o rule is more generally acknowledged, nor more fully sustained by reason than the one

-29-

which presumes every person to be of sound mind . . . .”  *Feree v. Commonwealth*, 236 S.W. 246, 248 (Ky. 1922).  *See also Scott v. Commonwealth*,  61 S.W.2d 1078, 1080 (Ky. 1933) (“[C]ommonwealth is not obliged to establish that he is sane, being entitled to rely on the presumption of sanity.”); *Cannon v. Commonwealth*, 47 S.W.2d 1075, 1078 (Ky. 1932) (“defendant . . . , long released from the [mental health] institution to which she had been committed, as restored, she was presumed sane at the time of the charged commission of the larceny offense”); *Arnold v. Commonwealth*, 240 S.W. 87, 90 (Ky. 1922) (“Every one is presumed to be sane”); *Wilcoxin v. Commonwealth*, 129 S.W. 309, 310 (Ky. 1910) (“[T]his presumption is to remain and continue unless the contrary is shown by the evidence to the satisfaction of the jury . . . .”).

The rule is ensconced in Kentucky statutes.  The General Assembly assigned the parties respective burdens in KRS 500.070, which states:

> (1) *The Commonwealth has the burden* of proving every element of the case beyond a reasonable doubt, *except as provided in subsection (3).* This provision, however, does not require disproof of any element that is entitled a “defense,” as that term is used in this code, unless the evidence tending to support the defense is of such probative force that in the absence of countervailing evidence the defendant would be entitled to a directed verdict of acquittal.

> (2) No court can require notice of a defense prior to trial time.

(3) *The defendant has the burden of proving an element of a case only if the statute which contains that element provides that the defendant may prove such element in exculpation of his conduct.*

(Emphasis added).

Specifically referencing subsection (3) of that statute, the Kentucky Crime Commission/LRC Commentary says:

In addition to requiring that the defendant raise a defense that is so designated, this subsection requires that he establish it *to the satisfaction of the jury*. With this procedural device, it is possible to cast upon a defendant a reasonable burden of proof in situations where it would be inequitable to require the state to disprove a fact beyond a reasonable doubt. An example of such a defense is insanity, *as defined in KRS 504.020*.

KRS 500.070 (Commentary) (emphasis added).

A statute to which KRS 500.070(3) alludes and which is expressly referenced in the statute's commentary is KRS 504.020. It states, in its entirety:

(1) A person is not responsible for criminal conduct if at the time of such conduct, as a result of mental illness or intellectual disability, he lacks substantial capacity either to appreciate the criminality of his conduct or to conform his conduct to the requirements of law.

(2) As used in this chapter, the term "mental illness or intellectual disability" does not include an abnormality manifested only by repeated criminal or otherwise antisocial conduct.

(3) A *defendant may prove mental illness or intellectual disability*, as used in this section, *in exculpation of criminal conduct*.

KRS 504.020 (emphasis added).

Furthermore, a defendant's absolution from criminal responsibility is not as easily concluded as the trial court appears to believe. Evidence of a mental disease or defect alone is not enough. There is a separate element this trial court never mentioned. As our highest court repeatedly says:

> [P]resentation of evidence merely proving the defendant to be suffering from some form of mental illness at the time of the offense, *without also proving him unable to appreciate the wrongfulness of his conduct or to resist his impulse to commit the illegal deed due to the perceived mental disease or defect*, will not relieve him from the consequences of his criminal act.

*Cannon v. Commonwealth*, 777 S.W.2d 591, 594 (Ky. 1989) (emphasis added) (quoting *Edwards v. Commonwealth*, 554 S.W.2d 380, 383 (Ky. 1977)). It is the petit jurors' duty to decide that question. It is not a judge's prerogative, and this is precisely why KRS 504.120(4) allows juries to find both *mens rea* and mental illness coexisting in the mind of a criminal defendant.[14] Imposing upon the

---

[14] The legislature recognizes the possibility of a jury's finding of guilt and its finding of mental illness existing in the same case, as KRS 504.120 makes possible. The statute states, in full:

> In cases in which the defendant provides evidence at trial of his mental illness or insanity at the time of the offense, the jury or court may find the defendant:
>
> (1)  Guilty;
>
> (2)  Not guilty;
>
> (3)  Not guilty by reason of insanity at the time of the offense; or

prosecutor the burden to prove Appellee's mental state is contrary to all this law and constitutes clear legal error.

6. *Looking behind the valid indictment is "unheard of."*

The trial court looked behind the indictment to assess whether the grand jury heard any evidence Appellee lacked the mental capacity to commit any crime when he killed Ms. Botkin. The Supreme Court of the United States simply called that "unheard of." The Court explained that such an approach:

> not only fails to comport with, but positively contradicts, the "common law" of the Fifth Amendment grand jury. Motions to quash indictments based upon the sufficiency of the evidence relied upon by the grand jury were unheard of at common law in England, see, *e.g.*, *People v. Restenblatt*, 1 Abb. Pr. 268, 269 (Ct. Gen. Sess. N.Y. 1855). And the traditional American practice was described by Justice Nelson, riding circuit in 1852, as follows:
>
> > "No case has been cited, nor have we been able to find any, furnishing an authority for looking into and revising the judgment of the grand jury upon the evidence, for the purpose of determining whether or not the finding was founded upon sufficient proof, or whether there was a deficiency in respect to any part of the complaint. . . ." *United States v. Reed*, 27 F. Cas. 727, 738 (No. 16,134) (CCNDNY 1852).

---

(4)     Guilty but mentally ill at the time of the offense.

KRS 504.120. This statute's reference to the alternatives of the "jury *or court*" making a finding permits the trial court to do so *only* when the defendant waives the right to a jury trial and the court serves as factfinder. Appellee did not waive jury trial. The trial court expropriated the jury's role for itself and ignored any potential of a finding under KRS 504.120(4) of guilty but mentally ill.

-33-

> We accepted Justice Nelson's description in *Costello v. United States*, where we held that "[i]t would run counter to the whole history of the grand jury institution" to permit an indictment to be challenged "on the ground that there was inadequate or incompetent evidence before the grand jury." 350 U.S., at 363–364, 76 S. Ct., at 409. And we reaffirmed this principle recently in *Bank of Nova Scotia*, [*supra*, 487 U.S. at 261, 108 S. Ct. at 2377].

*Williams*, 504 U.S. at 53–54, 112 S. Ct. at 1745–46.

Again, we state, *Costello* is the federal rule, and our Supreme Court held that Kentucky follows that rule, too. *Young*, 487 S.W.3d at 437. The trial court here pursued this unheard-of approach and said Appellee was not indictable because he was insane when he entered the intersection and killed Ms. Botkin. It was legal error for the trial court to engage in that undertaking.

7. *Trial court cannot weigh evidence to decide guilt or acquittal.*

Whether Appellee was experiencing a non-culpable mental state at the time of the collision is not an issue of law but a question of fact, provable by "competent evidence to be submitted to the jury *to enable them to determine . . .* [what] condition of mind existed at the time the crime was committed." *Sharp v. Commonwealth*, 215 S.W.2d 983, 984 (Ky. 1948) (emphasis added). Disregarding this jurisprudence and quoting a snippet from *Star v. Commonwealth*, 313 S.W.3d 30 (Ky. 2010), instead, the trial court dismissed because "'a finding of insanity functions as a complete defense to conviction.'" (TR 219) (quoting *Star*, 313 S.W.3d at 36). That refers to a petit jury's finding, not a judge's belief.

-34-

Just as the trial court took passages out of context from other cases such as *Craft*, *supra*, it did so again with *Star*. With a bit more context, *Star* says:

> A person found not guilty by reason of insanity is one who "lacks substantial capacity either to appreciate the criminality of his conduct or to conform his conduct to the requirements of law." KRS 504.020(1). A finding of insanity functions as a complete defense to conviction. *See Vaughn v. Commonwealth*, 204 Ky. 229, 263 S.W. 752 (1924). *A defendant who is mentally ill, but not insane, cannot make a similar claim.* By definition, the guilty but mentally ill offender is able to appreciate the wrongfulness of his behavior and is able to conform his conduct to the requirements of law.

*Star*, 313 S.W.3d at 36 (emphasis added).

Notably, *Star* quotes *Port v. Commonwealth*, *supra*, which sums up the issue, restating that the defendant's insanity when the crime was committed is for the defendant to prove and only if the defendant's evidence is "sufficient to present a jury issue" may the jury be instructed on the defense. 906 S.W.2d at 330. It is the defendant's burden of production to create that factual issue because "[t]he mere presence of any evidence does not necessarily enable the issue to be submitted for jury determination." *Id.* at 331.

*Port* also makes clear that the trial court is not allowed to weigh in on the issue unless the defendant presents evidence creating that jury issue *and moves for a directed verdict of acquittal*. *Id.* at 330 (discussing *Ice v. Commonwealth*, 667 S.W.2d 671 (Ky. 1984), *Trowel v. Commonwealth*, 550 S.W.2d 530 (Ky.

1977), and *Commonwealth v. Sawhill*, 660 S.W.2d 3 (Ky. 1983)). *Ice v. Commonwealth*, *supra*, says, "[T]he circumstances preceding the commission of the crime, the evidence regarding the circumstances surrounding its occurrence, and the activities of the accused thereafter . . . when taken as a whole" must be "sufficient to submit the issue of insanity to the jury." 667 S.W.2d at 678.

In the end, no matter the quantum of evidence the defendant presents to the judge before trial or to the jury during trial, the burden of proof never shifts to the Commonwealth. *Biyad v. Commonwealth*, 392 S.W.3d 380, 382 (Ky. 2013). We do not know yet what additional lay or even expert evidence might be presented to the petit jury to make up "the evidence as a whole." By ignoring this process, which is due the Commonwealth, the trial court committed legal error.

Still, there is more. The trial court misunderstands the role of experts.

8. *The jury would not have been required to believe any of Dr. Allen's report.*

The order dismissing the indictment can only be read as though the trial court presumes a jury would be *required* to interpret Dr. Allen's report exactly as did the trial court—as absolving Appellee of guilt because he was insane. Obviously, that is not so. *See, e.g.*, *Port*, 906 S.W.2d at 331 ("[M]ere presence of any evidence does not necessarily enable the issue to be submitted for jury determination."). Even Dr. Allen himself knows better, as his report itself states— "What weight, if any, this information has upon [Appellee's] proceedings will be

deferred to the trier-of-fact." There is much about expert testimony the trial court failed to consider before taking over the jury's function to weigh it.

First, because Appellee bears the burden of proving his state of mind short of *mens rea*, the Commonwealth will never be required even to introduce Dr. Allen's report, or to summon the doctor to testify at trial.

Second, if Dr. Allen does testify at trial, he cannot vouchsafe the truth of what Appellee told him. "[T]he doctor may not testify about the credibility of [Appellee] or state that he believes h[im]." *Hoff v. Commonwealth*, 394 S.W.3d 368, 377 (Ky. 2011). If there is a trial, the presiding judge will be duty bound to make "clear to the jury that the question of whether or not to believe [statements made by the subject of the expert's report] is one that the jury must answer, not the expert doctor . . . ." *Id.* Our Supreme Court warned "the more that courts permit experts to advise the jury based on probability, classifications, syndromes and traits, the more we remove the jury from its historic function of assessing credibility." *Newkirk v. Commonwealth*, 937 S.W.2d 690, 696 (Ky. 1996). When the trial court took Appellee's statements at face value, it blew past this warning, deprived the jury of its prescribed role, and assumed that role for itself.

Third, assuming this case goes to trial, and assuming Appellee testifies to the facts he told Dr. Allen, and assuming the hearsay from Appellee's son, mother, and girlfriend can be admitted by the original speakers' testimony or

otherwise, and assuming the jury deems it all credible, the jury is still free to

believe or disbelieve the doctor's expert opinion that Appellee experienced a

psychotic episode. *Butcher v. Commonwealth*, 96 S.W.3d 3, 8 (Ky. 2002) (jury

was aware expert witness "was expressing his opinion, and the jury was free to

accept or disregard it"). It has always been so that:

> The opinions of experts . . . are not to be passively received
> and blindly followed, but are to be weighed by the jury,
> and judged of in view of all the testimony in the case and
> the jury's own general knowledge of affairs, and have
> only such consideration given them as the jury may
> believe them entitled to receive.

*Louisville & N.R. Co. v. Burnam*, 284 S.W. 391, 397 (Ky. 1925) (citation omitted).

Not only did the trial court rely on blind faith that Appellee told Dr. Allen the

truth, but it also cherry-picked parts of Dr. Allen's opinion and report that might

support a defense of insanity, ignoring, disbelieving,[15] or exaggerating[16] the rest.

Then, of course, there is the *credibility* of the expert himself. It is the

province of the jury to assess "the credibility of every witness presented to testify

---

[15] The trial court perceived Dr. Allen's report as "peculiar in that its conclusions are not wholly consistent with its findings." (TR 208).

[16] The trial court deceptively implied Dr. Allen diagnosed Appellee as having experienced psychotic episodes before the collision, stating, "Dr. Allen's own report documents that [Appellee] likely experienced *multiple* other psychotic episodes in the months leading up to the accident which were nearly identical in nature." (TR 211). In fact, Dr. Allen merely recorded that Appellee's mother and girlfriend said he had "much milder, symptoms a few times over the months before this accident." (Dr. Allen's Report, p. 6). But Dr. Allen was clear that, in his opinion, this psychotic episode was, for Appellee, a once-in-a-lifetime experience. (VR 5/8/23: 10:26 ("never had one before" and "never had one again")).

in a legal proceeding, including expert witnesses . . . ." *Brown v. Commonwealth*, 934 S.W.2d 242, 247 (Ky. 1996) (quoting *Edwards*, 554 S.W.2d at 385). Studies show jurors "do not accept expert testimony on face value. They consider credentials and expertise, but are actively engaged with the content and attempt to assess the accuracy of what the experts say." Andrew W. Jurs, *Expert Prevalence, Persuasion, and Price: What Trial Participants Really Think About Experts*, 91 IND. L.J. 353, 360 (2016) (footnotes omitted). The trial court's order saved Appellee from, and deprived the factfinders of, that active juror engagement.

Next, the trial court relies on the Commonwealth's failure to contradict Dr. Allen's report that, as the trial court puts it, Appellee was not sane when he struck Ms. Botkin's vehicle.[17] But "[i]t would not be clearly unreasonable for a jury to find against the defendant on the issue of insanity, regardless of the fact that all of the expert testimony was to the contrary." *Ice*, 667 S.W.2d at 678.

The trial court's position ignores jurisprudence that "[t]he jury is not required to believe the testimony of an expert witness *even though it is uncontradicted* when such testimony is so much at variance with common experience and the usual course of human conduct as to make it unbelievable."

---

[17] *See, e.g.*, TR 219 ("no evidence . . . Defendant was 'sane' at the time of the accident."); TR 224 ("no evidence to contradict that [Appellee] was suffering a psychotic break the morning of the accident"). This lack of contradiction is the basis for the trial court's conclusion there was no genuine dispute about this material fact. Failing to recognize it was invading the province of the jury by deciding the issue of insanity, the court decided an ultimate fact of the case. (TR 215–16).

*Turfway Park Racing Ass'n v. Griffin*, 834 S.W.2d 667, 674 (Ky. 1992) (emphasis added) (Wintersheimer, J., concurring), *overruled on other grounds by Louisville SW Hotel, LLC v. Lindsey*, 636 S.W.3d 508 (Ky. 2021) (citation omitted). *See also Taylor*, 671 S.W.3d at 44 (same).

*Mitra v. Commonwealth*, a capital murder case, illustrates what Justice Wintersheimer referenced in *Turfway Park*—the irreplaceable, inherent value of a jury's collective common experience and understanding of human conduct in the pursuit of justice. 5 S.W.2d 275 (Ky. 1928). There is no indication in *Mitra* that the Commonwealth presented any expert witness to contradict "the experts [who] testified that [the defendant] did not know right from wrong at the time he fired the fatal shot[.]" *Id.* at 277. The prosecutor apparently trusted the jurors, believing "they knew more about whether [the defendant] was responsible for the crime he committed than learned experts who testify about such things from information obtained by methods considered reliable by them." *Id.* Our high court concluded:

> The jury did itself credit when it rejected the theory of the defense that [he was] . . . rendered irresponsible for his actions for a period of 45 seconds. He had mind enough to reason about the crime up to the beginning of this period of 45 seconds, and he had mind enough to escape immediately after the 45 seconds had expired, and we do not believe that any jury of good citizens would accept his statements or the statements of experts that for the brief space of 45 seconds he was insane . . . .

-40-

*Id*.  Granted, this excerpt from *Mitra* does not include particulars that might lead a jury to distinguish that case from this.  We are certain however that dismissing the indictment prevented a jury from doing its job of answering that very question.

Simply put, the trial court chose only certain parts of Dr. Allen's report and testimony, gave that evidence the weight of conclusive proof, and took the case from the jury before trial.  That was most certainly error.

In *Pendleton v. Commonwealth*, the Supreme Court "held that a clinical psychologist should not be permitted to testify that the defendant lacked the state of mind required to commit the crimes with which he was charged."  685 S.W.2d 549, 553 (1985).  That is, it is wholly impermissible for an expert to say whether a defendant lacked *mens rea*.  So, even if Dr. Allen were to testify at trial, he would be prohibited from testifying to what the trial court believed he said— that Appellee was not sane when he sped, ran a red light, and killed Ms. Botkin.  The trial court's reading of Dr. Allen's report as constituting irrefutable proof of Appellee's insanity was both improper and an invasion of the petit jury's province, just as the Supreme Court said in *Hester v. Commonwealth*:

> An opinion as to whether the accused had the ability or propensity to commit such an act is improper because it is an opinion on the ultimate fact, that is, innocence or guilt.  Consequently, it invades the proper province of the jury.  Such an opinion is not evidence of mental condition but is a factual conclusion of the witness on the ultimate issue before the jury which can be reached only by consideration of all the facts.

734 S.W.2d 457, 458–59 (Ky. 1987). *See also Newkirk*, 937 S.W.2d at 692 ("An opinion as to whether the accused had the ability or propensity to commit such an act . . . invades the proper province of the jury.").

Contrary to all this law and all these facts, the trial court decided Appellee should be absolved of criminal responsibility because the Commonwealth had "no evidence to contradict that the Defendant was suffering a psychotic break the morning of the accident[,]" (TR 224), equating that as an irrebuttable, irrefutable fact of both Appellee's insanity and, apparently of necessity, his inability to appreciate the nature of his conduct. When the trial court weighed the evidence of Appellee's mental state and concluded the defense carried *its* burden of proof of the ultimate fact of Appellee's insanity, it turned considerable jurisprudence on its head by arrogating to itself the petit jury's factfinding role—all reversible error.

9. *Dismissal thwarted the statutory "safeguard for society."*

In 1974, Kentucky legislators anticipated that some criminal defendants would be found not guilty by reason of insanity. Absent "some kind of realistic provision for their detention" other than a penal institution, there was "very little, if any, assurance that they will not soon be at large again." *Jewell v. Commonwealth*, 549 S.W.2d 807, 812 (Ky. 1977), *overruled on other grounds by Payne v. Commonwealth*, 623 S.W.2d 867 (Ky. 1981). The legislature set about

enacting an "adequate provision for the safekeeping" of such persons rather than waiting until they again "demonstrate[] harmful propensities by acts of violence against others" while lacking *mens rea*. *Id.* The result was KRS 504.030 which currently states:

> (1) When a defendant is found not guilty by reason of insanity, the court shall conduct an involuntary hospitalization proceeding under KRS Chapter 202A or 202B.
>
> (2) To facilitate the procedure established in subsection (1) of this section, the court may order the detention of the defendant for a period of ten (10) days to allow for proceedings to be initiated against the defendant for examination and possible detention pursuant to the provisions of KRS Chapter 202A or 202B.

The legislature enacted the statute as "a necessary safeguard for society in the event of an acquittal based upon legal insanity." *Id.* (Kentucky Crime Commission/LRC Commentary, 1974). It imposes a duty upon the court, before setting the defendant free, to determine his propensity for committing another crime while deprived of the ability of knowing the harm he can cause.

Despite Dr. Allen's conclusion to the contrary, the trial court interpreted the report and testimony as supporting the court's own factual finding that Appellee "likely experienced *multiple* other psychotic episodes in the months

-43-

leading up to the accident which were nearly identical in nature."[18] (TR 211). And yet the court gave no thought to complying with KRS 504.030(1) despite its own factual conclusion and the legislatively recognized potential of Appellee further jeopardizing even the very lives of innocent citizens like Ms. Botkin.

Rather than risk the possibility of a jury finding Appellee sane at the time of the accident, the trial court intervened. But that intervention did not eliminate all need for the safeguard of KRS 504.030(1). Dismissal without prejudice does not prevent reindictment and, until that happens, dismissal is tantamount to acquittal, setting Appellee free and leaving the public vulnerable to not knowing whether another psychotic episode is in the offing. The court's unorthodox process set Appellee free without the benefit of this societal safeguard.

KRS 504.030(1) is a straightforward mandate—"the court *shall* conduct an involuntary hospitalization proceeding[.]" *Id.* (emphasis added). Whatever the trial court might believe, usurping the jury's role in determining sanity or insanity did not dispense with the requirement to comply with KRS 504.030. "KRS 504.030 provides that the procedure for commitment of the

---

[18] As previously noted, this interpretation contradicts Dr. Allen's report that Appellee had never experienced a psychotic episode before nor has he since.

-44-

criminally insane *in all instances* should be commenced under the provisions of KRS Ch 202." *Id.* (Commentary) (emphasis added).[19]

This failure to comply with KRS 504.030 is legal error, too, even if it is lost in the sea of other, more determinative errors.

Summarizing this Section III.A, we cannot affirm the trial court's order on the ground either (1) that the evidence the Commonwealth presented to the grand jury was insufficient to support indictment, or (2) that it is impossible for the Commonwealth to present sufficient evidence to obtain a conviction at trial.

**B.** ***Sua Sponte* Dismissal for Prosecutorial Misconduct Was Founded on Numerous Reversible Errors and Abuses of Discretion and Authority.**

The trial court did not stop after ruling in Appellee's favor on the only issue he presented. Rather, it began its own quest to find prosecutor wrongdoing. Its erroneous finding of prosecutorial misconduct was the first fruit of that quest. Its *sua sponte* dismissal of the indictment exemplifies what the Supreme Court of the United States denounces—the tyranny of a trial court's "'chancellor's foot'[20]

---

[19] RCr 9.90(2) states: "When such a verdict [not guilty by reason of insanity] is returned the court *may* on motion of the prosecuting attorney or on its own initiative dispose of the defendant in accordance with KRS 504.030." (Emphasis added). If it should be argued this rule makes discretionary what the legislature intended as mandatory, the simple response is that the necessary predicate action to that discretion—the jury's return of a verdict—never occurred. The trial court did not have the discretion to refrain from conducting the KRS Chapter 202 hearing, and its dismissal of the indictment deprived the Commonwealth of its discretion to pursue one.

[20] **Chancellor's foot** (17c) A symbol of the variability of equitable justice. • John Selden, the 17th-century jurist, is thought to have coined the phrase in this passage, from his best-known book:

veto over law enforcement practices of which it did not approve." *United States v. Russell*, 411 U.S. 423, 435, 93 S. Ct. 1637, 1644, 36 L. Ed. 2d 366 (1973) (reverses dismissal of indictment "for what [district court] feels to have been 'overzealous law enforcement'").

The prosecutorial misconduct ruling is chock full of errors that fall in three categories, those occurring:

- by the manner in which the trial court took *sua sponte* action;

- by looking behind a facially valid indictment; and

- by misapplying prosecutorial misconduct jurisprudence.

We will address each in turn below. However, we would be remiss if we did not start by correcting the trial court's fundamental misconception about prosecutorial misconduct.

1. *Trial court misunderstands prosecutorial misconduct.*

A fundamental misconception appears to be the source of the trial court's many deviations from our jurisprudence. The court stated its belief that

---

Equity is a roguish thing. For law we have a measure, know what to trust to: equity is according to the conscience of him that is Chancellor, and as that is larger or narrower, so is equity. "Tis all one as if they should make the standard for the measure the Chancellor's foot. What an uncertain measure would this be! One Chancellor has a long foot, another a short foot, a third an indifferent foot; 'tis the same thing in the Chancellor's conscience." *Table Talk* 18 (1689).

*Chancellor's foot*, BLACK'S LAW DICTIONARY (12th ed. 2024).

"Caselaw most commonly addresses prosecutorial misconduct *during grand jury proceedings . . . .*" (TR 214) (emphasis added). That is simply not so.

Though fortunately not a regular feature of jury trials, prosecutorial misconduct occurs during trial so much more often than at any pre-trial stage we define it in that context—never mentioning grand jury proceedings—as follows:

> Prosecutorial misconduct is a prosecutor's improper or illegal act involving an attempt to persuade the jury to wrongly convict a defendant or assess an unjustified punishment. The misconduct can occur in a variety of forms, including improper closing argument.

*Murphy v. Commonwealth*, 509 S.W.3d 34, 49 (Ky. 2017) (double emphasis added) (internal quotation marks, citations, and emphasis omitted).

A judge who harbors such a misconception is more inclined to also believe it is within her authority to engage in *sua sponte* examination of the propriety of grand jury proceedings. That is woefully incorrect but, in this case, it is what this judge did.

### *Sua Sponte* **Action**

2. Sua sponte *judicial action can be injudicious, as in this case.*

*Sua sponte* court action is sometimes permissible and even required,[21] but pursuing issues the parties never raised risks an appearance that the trial court

---

[21] For example, the matter of appellate jurisdiction is an issue this Court is required to raise *sua sponte*, "as it cannot be acquired by waiver, consent, or estoppel." *Doe v. Golden & Walters, PLLC*, 173 S.W.3d 260, 270 (Ky. App. 2005) (footnotes omitted). On the other hand, by way of

assumed an advocacy role. Taking that risk provides grist for rumor mills and prompts charges of judicial activism negatively affecting the entire Court of Justice. This trial court chose to take that risk, despite already ruling in Appellee's favor on the only ground he raised.

Appellee presented no evidence of prosecutorial misconduct. It was the trial court's own idea to search for it, to declare it found, and to present its evidence *sua sponte*. In doing so, the trial court committed legal error by failing to provide due process notice to the Commonwealth and abused its discretion by ignoring the party-presentation principle as discussed below.

### 3. *No notice that prosecutor's conduct was an issue in the judge's mind.*

"Of course, before acting on its own initiative, a court must accord the parties fair notice and an opportunity to present their positions." *Day v. McDonough*, 547 U.S. 198, 210, 126 S. Ct. 1675, 1684, 164 L. Ed. 2d 376 (2006) (footnote omitted). The trial court here gave no notice to the Commonwealth that it was covertly evaluating the prosecutor's conduct. Consequently, the prosecutor was not prepared at the hearing to defend a misconduct charge. In the end, that did not matter anyway. The trial court did not mention it was searching for

_____

example, a trial court is not permitted to grant CR 60.02 relief *sua sponte*. CR 60.02 (permitting relief from a final judgment only "[o]n motion"); *Commonwealth v. Sharp*, No. 2005-CA-000810-MR, 2007 WL 3406912, at *2 (Ky. App. Nov. 16, 2007) ("We are unable to locate any precedent giving a trial court discretion to *sua sponte* grant CR 60.02 relief, and thus hold such authority does not exist.").

prosecutorial misconduct even *during* the hearing.  The order itself proclaiming the

discovery of misconduct is how the Commonwealth found out the trial court was

even searching for it.  (Appellant's Br., pp. 7–8).

As we said in a prior opinion when another judge engaged in similar

conduct, "The hallmark of procedural due process is . . . notice and an opportunity

to be heard . . . at a meaningful time and in a meaningful manner.'" *Delahanty v.

Commonwealth*, 558 S.W.3d 489, 506–07, 506 (Ky. App. 2018) (citations

omitted).  This trial court provided neither.

"Our criminal and civil procedural rules are designed to prevent

litigants from engaging in 'trial by ambush.'  The judiciary must also play by these

same rules if the integrity of our judicial system is to withstand the test of time and

the public's scrutiny." *Delahanty*, 558 S.W.3d at 507.  The trial court in this case

conducted a judicial ambush.  That is clear error, but that is not all.

### 4. *Trial court abused its discretion by ignoring the party-presentation doctrine.*

"Courts are essentially passive instruments of government." *United

States v. Sineneng-Smith*, 590 U.S. 371, 376, 140 S. Ct. 1575, 1579, 206 L. Ed. 2d

866 (2020) (internal quotation marks, citation, and bracketing omitted).  "They do

not, or should not, sally forth each day looking for wrongs to right.  They wait for

cases to come to them, and when cases arise, courts normally decide only questions

presented by the parties." *Id.* at 376, 140 S. Ct. at 1578 (internal quotation marks,

-49-

citation, and bracketing omitted).  This Court is entirely in accord.  *Delahanty*, 558 S.W.3d at 503 n.16 (citations omitted) ("The premise of our adversarial system [of justice] is that . . . courts do not sit as self-directed boards of legal inquiry and research, but essentially as arbiters of legal questions presented and argued by the parties before them.").

"[I]n both civil and criminal cases, *in the first instance*[22] and on appeal . . . , we rely on the parties to frame the issues for decision and assign to courts the role of neutral arbiter of matters the parties present." *Greenlaw v. United States*, 554 U.S. 237, 243, 128 S. Ct. 2564, 171 L. Ed. 2d 399 (2008) (emphasis added).  It is a system "designed around the premise that parties represented by competent counsel know what is best for them, and are responsible for advancing the facts and argument entitling them to relief." *Sineneng-Smith*, 590 U.S. at 375–76, 140 S. Ct. at 1579 (internal quotation marks and bracketing omitted) (quoting *Castro v. United States*, 540 U.S. 375, 386, 124 S. Ct. 786, 157 L. Ed. 2d 778 (2003) (Scalia, J., concurring in part)).  This is known as the "party-presentation principle." *Id.*

If the trial court in the instant appeal had abided by the principle and based its dismissal on the only issue the parties presented—a lack of evidence—we would have ceased review at the end of Section III.A. and vacated the order

---

[22] In *Greenlaw*, the Supreme Court was clear that the principle applies equally to trial courts.

dismissing. But, for reasons known only to the trial court, it chose to ignore the principle and advance with vigor two additional *sua sponte* bases for dismissing.

We acknowledge the party-presentation principle "is supple, not ironclad. There are no doubt circumstances in which a modest initiating role for a court is appropriate." *Id.* at 376, 140 S. Ct. at 1579. So far, however, the jurisprudence limits that role "to protect[ing] a **pro se** litigant's rights." *Id.* at 375, 140 S. Ct. at 1579 (emphasis added) (quoting *Greenlaw*, 554 U.S. at 244, 128 S. Ct. at 2559). Departure from the principle is tolerated to "avoid an unnecessary dismissal" or an "inappropriately stringent application of formal labeling requirements, or to create a better correspondence between the substance of a *pro se* motion's claim and its underlying legal basis[.]" *Castro*, 540 U.S. at 381–83, 124 S. Ct. 786 (citation omitted).

But Appellee has been represented by counsel from the beginning. Any permissible "modest initiating role" all but disappears when the party has legal counsel and so will not prevent a finding here that this trial court abused its discretion when it ignored the principle and raised, researched, and decided an issue without party prompting or participation.

The question for this Court of Appeals is whether the principle is sufficiently "supple" that the trial court could ignore it under these circumstances. Case law on the issue answers the question resoundingly in the negative.

-51-

Like Appellee here, the defendant in *Sineneng-Smith*, *supra*, moved to dismiss the indictment against her but, also like Appellee, "[n]owhere did she so much as hint" at the grounds on which the trial court ultimately based dismissal. 590 U.S. at 377, 140 S. Ct. at 1580. As here, once Sineneng-Smith's case was "poised for decision based upon the parties' presentations, the [court] intervened." *Id.* at 378, 140 S. Ct. at 1580. Paralleling the district judge's thinking in *Sineneng-Smith*, this trial judge did not stop after addressing the sole argument framed by the parties. In effect, the judges in both cases said, "Nevermind that [Appellee's] counsel had presented a contrary theory of the case . . . ." *Id.* at 380, 140 S. Ct. at 1581. Both judges improvidently chose to pursue their own theories *sua sponte*.

What was said in *Sineneng-Smith* applies equally here. "[A] court is not hidebound by counsel's precise arguments, but the [trial court's] radical transformation of this case goes well beyond the pale." *Id.* at 380, 140 S. Ct. at 1581–82. This trial court, too, radically transformed Appellee's argument, and the entire case in fact, to suit its questionable agenda of challenging the prosecutor's conduct and "depart[ing] so drastically from the principle of party presentation as to constitute an abuse of discretion." 590 U.S. at 375, 140 S. Ct. at 1578.

**Looking Behind the Indictment**

We touched upon the trial court's peering behind the indictment in Section III.A.6, *supra*. We deferred a more thorough discussion of its impropriety

until this Section III.B because it seems to us especially improper when conducted in a trial court's lone pursuit of evidence of prosecutor wrongdoing.

The trial court's decision to look behind the indictment to check the prosecutor's and the grand jury's work completely ignores Kentucky's longstanding jurisprudence that emphasizes and reinforces our trial courts' detachment from the grand jury process and the constitutional independence of the grand jury itself.

5. *A century and three-quarters of unwavering jurisprudence.*

Kentucky precedent, well understood for more than 170 years, is that virtually nothing that occurs during statutory grand jury proceedings[23] can be so irremediably harmful to a defendant's chances at trial that the only cure is dismissal before trial. Consequently, we rarely permit looking behind the indictment. Our caselaw is replete with failed arguments urging the pre-trial dismissal of indictments on such grounds as grand juror bias,[24] perjured

---

[23] A "statutory grand jury" is one drawn and empaneled in the manner and as required by statute. *Parker v. Commonwealth*, 182 S.W.2d 653, 654 (Ky. 1944). *See also* KRS 29A.060. When there is "a complete failure to observe any of the procedural steps designated in the applicable statutes in respect to the summoning of the grand jury that returned the indictment against appellants[, it] . . . must be set aside and held for naught." *Gill v. Commonwealth*, 374 S.W.2d 848, 849–50 (Ky. 1964). Nothing approaching that occurred in this case.

[24] "[W]ith respect to individual grand jurors, . . . '[c]hallenges for bias, or for any cause other than lack of legal qualifications, are unknown as concerns grand jurors.'" *Partin v. Commonwealth*, 168 S.W.3d 23, 30 (Ky. 2005), *superseded by statute on other grounds as stated in Stansbury v. Commonwealth*, 454 S.W.3d 293 (Ky. 2015) (quoting *United States v. Knowles,* 147 F. Supp. 19,

testimony,[25] that the crime victim served as grand jury foreman,[26] and that a juror presented his own testimony to the grand jury.[27] This precedent has guided us since at least the 1850s. We codify it today in RCr 5.10, which states:

> The grand jurors shall find an indictment where they have received what they believe to be sufficient evidence to support it, but no indictment shall be quashed or judgment of conviction reversed on the ground that there was not

20 (D.D.C. 1957)). "The basic theory of the functions of a grand jury, does not require that grand jurors should be impartial and unbiased." *Id.* (quoting *Knowles*, 147 F. Supp. at 20–21).

[25] It is illogical, and has not been Kentucky practice, to dismiss an indictment for perjured grand jury testimony. Such perjury is manifestly curable in multiple ways.

In *Rolli v. Commonwealth*, this Court held that dismissal of the indictment was not justified either by a prosecution witness's "perjury before the grand jury" nor the prosecutor's "fail[ure] to inform appellant of [the witness's] grand jury perjury . . . ." 678 S.W.2d 800, 801, 802 (Ky. App. 1984). The Court had granted a new trial because the Commonwealth withheld knowledge of the grand jury perjury, denying the defendant of an opportunity to impeach the witness's credibility at trial.

In *Cash v. Commonwealth*, we have assurance that perjured grand jury testimony is curable by truthful testimony before the petit jury. 892 S.W.2d 292, 293 (Ky. 1995) (witnesses admitted to perjury before grand jury and were given opportunity to "respond[] truthfully and honestly to all the questions at trial").

*Commonwealth v. Sesco* proves the cure to grand jury perjury can be complete. 132 S.W.2d 314, 315 (Ky. 1939). In *Sesco*, a grand jury witness testified that the defendant assaulted her but, after testifying contrariwise at trial, the petit jury acquitted.

The truth at trial is not the only cure. In *Goble v. Mattox*, the prosecutor simply decided "superseding indictments were required due to Goble's perjurious statements before the first grand jury[.]" 636 S.W.3d 537, 540 n.1 (Ky. 2021). In this very case under review, nothing prevents Appellee's reindictment.

[26] The fact that "one of the owners [of property the defendant was charged with stealing], a prosecuting witness, was foreman of the indicting grand jury . . . affords no ground for quashing the indictment." *Hammer v. Commonwealth*, 332 S.W.2d 267, 267–68 (Ky. 1959).

[27] "It is readily apparent that the giving of testimony by a grand juror is consistent with his duty as a grand juror and affords no ground for quashing the indictment." *Partin*, 168 S.W.3d at 31 (internal quotation marks and citation omitted).

sufficient evidence before the grand jury to support the indictment.

Our understanding of how RCr 5.10 limits a trial judge's authority vis-à-vis grand jury proceedings derives from jurisprudence interpreting its predecessor, Section 107 of our former Criminal Code. *See, e.g.*, Ky. Crim. Code of Prac. § 107 (1948).[28] Section 107 was part of the Criminal Code that became effective on July 1, 1854, and it prompted quite a bit of interpretive jurisprudence. *Commonwealth v. Patterson*, 59 Ky. 374, 375 (1859). Neither the underlying principle nor the interpretations of its codifications has ever changed in substance. Our Supreme Court held that "the logic and rationale" of jurisprudence interpreting Section 107 "applies as well to . . . RCr 5.10." *Jackson v. Commonwealth*, 20 S.W.3d 906, 908 (Ky. 2000). So, what is that jurisprudence?

The cornerstone opinion is *Commonwealth v. Minor*, 13 S.W. 5 (Ky. 1890). In *Minor*, the trial court set aside an indictment because it was based on "incompetent testimony." *Id*. at 5–6. "The first question naturally arising[,]" said the reviewing court, "is whether the lower court had authority to inquire at all

_____

[28] Unchanged at least since 1919 and until superseded by RCr 5.10, *see* Ky. Crim. Code of Prac. § 107 (1919), Section 107 was titled "Evidence that jury may hear" and reads as follows:

> The grand jury can receive none but legal evidence; they are not bound to hear evidence for the defendant; but it is their duty to weigh all evidence before them, and if they believe that other evidence, within their reach, will explain away the charge, they should order the evidence to be produced.

Ky. Crim. Code of Prac. § 107 (1948).

about the competency of evidence given before the grand jury, and to set aside the indictment, even if the testimony of [a grand jury witness] was incompetent." *Id.* at 6. Defendant/appellee Minor seized on the statute's opening statement that "The grand jury can receive none but legal evidence[.]" *Id.* Citing that language, he argued an indictment must be dismissed if it is based on other than "legal evidence." Our highest court rejected the argument.

> [T]he provisions of that section are merely directory, and . . . intended thereby no more to give the court the power to revise the action of the grand jury, in respect to the character of evidence received by them, than to authorize it to require or compel them to hear additional evidence that might, in the opinion of the court, explain away the charge . . . .

*Id.* at 6; *Gordon v. Tracy*, 238 S.W. 395, 398 (Ky. 1922) (quoting *Minor*, 13 S.W. 5). *See McIntire v. Commonwealth*, 4 S.W. 1, 2 (Ky. 1887) (it "was never intended, that the court can inquire whether witnesses have been examined before the grand jury in support of an indictment returned by it"); *Raney v. Commonwealth*, 2 Ky. L. Rptr. 62, 10 Ky. Op. 930, 931 (Ky. 1880) ("court properly refused to permit any inquiry into the question whether any evidence was heard by the grand jury").

In 1951, the former Court of Appeals followed *Minor* in *Bircham v. Commonwealth* in which two police officers were shot, indictments issued from separate grand juries, and the defendant moved to set aside both indictments

because "no competent testimony or evidence was heard or viewed by either grand jury." 238 S.W.2d 1008, 1011 (Ky. 1951). Aware that a few other jurisdictions permitted trial courts to probe grand jury proceedings, the Court of Appeals said:

> Irrespective of any rule which may obtain in other jurisdictions, our rule of long standing prevails in a majority of states, and is . . . [that] the court will not inquire into the legality or sufficiency of the evidence on which an indictment is based even if it is averred that no legal evidence was produced before the grand jury.

*Id. See also* RCr 5.10 ("[N]o indictment shall be quashed or judgment of conviction reversed on the ground that there was not sufficient evidence before the grand jury to support the indictment.").

If *Minor* is the cornerstone of this area of the law, *Rice v. Commonwealth*, 288 S.W.2d 635 (Ky. 1956), is the keystone. *Rice* says, "[W]hen a grand jury issues an accusatory writ, it is, in fact, an indictment, *however defective it may be*." *Id*. at 637–38 (emphasis added). Like the defendant in *Bircham*, Rice wanted Kentucky courts to chart a new path. Rice pressed the issue even more fervently than Bircham did in his case, but Rice failed, too.

> Appellant argues, . . . on authority from other state and federal jurisdictions, that the rule is not a sound one and requests that we reconsider and change it. While we agree that the courts of this country are not in accord on this question, we think the trend of the decisions is in the course adopted so long ago by this court.

In the latest case we have been able to find, *Costello v. United States*, the court, after pointing out that our grand jury system is founded on the English institution, said this:

> . . . . Grand jurors were selected from the body of the people and *their work was not hampered by rigid procedural or evidential rules*. . . . [T]he grand jury . . . acquired an independence . . . free from control by the Crown or judges. . . . [T]he grand jury has convened as a body of laymen, free from technical rules, acting in secret, pledged to indict no one because of prejudice and to free no one because of special favor.

*Id*. at 638 (quoting *Costello*, 350 U.S. at 362, 76 S. Ct. at 408) (emphasis added).

Beyond the insular, independent nature of grand jury proceedings, *Rice* also quoted and adopted the ruling of the Supreme Court of the United States that the Judicial Branch's authority to make rules *for the courts* cannot be used to review the sufficiency of a grand jury's proceedings.

> Petitioner urges that this Court should exercise its power to supervise the administration of justice . . . and establish a rule permitting defendants to challenge indictments on the ground that they are not supported by adequate or competent evidence. No persuasive reasons are advanced for establishing such a rule. It would run counter to the whole history of the grand jury institution, in which laymen conduct their inquiries unfettered by technical rules. Neither justice nor the concept of a fair trial requires such a change.

*Id.* (internal quotation marks omitted) (quoting *Costello*, 350 U.S. at 362, 76 S. Ct. at 408).

The Court in *Rice* then reaffirmed *Minor*, stating, "We are not, therefore, disposed to change our rule." *Id. See also Harrell v. Commonwealth*, 328 S.W.2d 531, 532 (Ky. 1959) (citing *Rice*, 288 S.W.2d 635) ("The legality and sufficiency of evidence heard by a grand jury is not subject to review in this Court."). What evidence the prosecutor presents that contributed to the grand jury's investigation is entirely up to the prosecutor and the grand jurors themselves. *See* RCr 5.02 (After court swears the grand jurors they are charged "to inquire into . . . offenses which come to their attention or of which any of them has knowledge.").

Nearly a half century after *Rice*, and after RCr 5.10 was created, our Supreme Court again reaffirmed what we shall call—for the sake of convenience— the *Minor/Rice* rule. Applying that rule, our high court once again denied another challenge to the prosecutor's presentation of evidence to the grand jury. In *Jackson v. Commonwealth*, *supra*, a grand jury returned indictments on charges of second-degree escape and being a persistent felony offender (PFO). 20 S.W.3d at 908. Jackson moved to dismiss the latter indictment claiming, "the audiotape of the grand jury proceedings does not reflect that any evidence supporting the PFO charge was presented to the grand jury." *Id.* Nevertheless, "[h]is pretrial motion to dismiss the PFO count on this ground was denied." *Id.* Reaffirming the

consistency of our jurisprudence notwithstanding the transition from Ky. Crim.

Code of Prac. § 107 to RCr 5.10, the Court said:

> Criminal Rule 5.10 states that "[t]he grand jurors shall find an indictment where they have received what they believe to be sufficient evidence to support it." Appellant argues that the grand jurors could not possibly have believed that [the prosecutor presented[29]] sufficient evidence to support the PFO indictment if no evidence at all was presented to them. This issue was addressed and resolved in *Rice v. Commonwealth,* Ky., 288 S.W.2d 635 (1956) . . . .
>
> Although the Court in *Rice* was addressing section 107 of the former Criminal Code of Practice and its mandate that the grand jury "receive none but legal evidence," the logic and rationale of *Rice* applies as well to the requirement of RCr 5.10. Both rules are "directed to the grand jury and not to the courts," and therefore *it is not for the courts to look behind the face of the indictment*.

*Id.* (emphasis added) (citations omitted).

The same reasoning forever has been embraced in our federal courts.

As the Supreme Court of the United States said not so long ago:

> [T]he whole history of the grand jury institution demonstrates that a challenge to the reliability or competence of the evidence supporting a grand jury's finding of probable cause will not be heard. The grand jury gets to say—without any review, oversight, or second-guessing—whether probable cause exists to think that a person committed a crime.

---

[29] We substitute this synonymous phrase for the original, "that they had received," because they are substantive equivalents, and we are addressing the conduct of the prosecutor. *United States v. Williams*, 504 U.S. 36, 54, 112 S. Ct. 1735, 1746, 118 L. Ed. 2d 352 (1992) ("A complaint about the quality or adequacy of the evidence [presented to a grand jury] can always be recast as a complaint that the prosecutor's presentation was 'incomplete' or 'misleading.'").

*Kaley v. United States*, 571 U.S. 320, 328, 134 S. Ct. 1090, 1097–98, 188 L. Ed. 2d 46 (2014) (citing among other opinions *Costello*, 350 U.S. at 364, 76 S. Ct. 406, and *Bank of Nova Scotia*, 487 U.S. at 261, 108 S. Ct. 2369). *See In re Ryan*, 709 S.W.3d 177, 187 (Ky. 2024) (quoting *Costello*, 350 U.S. at 363, 76 S. Ct. 406).

To this day then, we have this straightforward interpretation of RCr 5.10 in the *Minor/Rice* rule, one of the longest-standing, well-reasoned constants in our jurisprudence, and most recently discussed and followed mere months ago in an unpublished Supreme Court opinion, *Shelton v. Commonwealth*, No. 2023-SC-0166-MR, 2025 WL 555502, at *5 (Ky. Feb. 20, 2025).

*6. Trial court ignored limits of its supervisory authority.*

The order on appeal presents the option of two unmistakable presumptions. Either the trial court lacks all knowledge of this jurisprudence or chose to ignore it. On the other hand, it was aware of its inherent supervisory powers, if not its limits. It dispatched this case by a wielding of those powers as though the *Minor/Rice* jurisprudence does not exist. We will attempt clarification of the scope of these powers, for this trial court's sake at the least.

Until an indictment issues, a trial court's authority over grand jury proceedings is circumscribed by RCr 5.02 to RCr 5.24, to be exercised when the grand jury foreperson employs the trial court to exercise specific authority the foreperson lacks. *See, e.g.*, RCr 5.06 (compelling attendance of witnesses); RCr

5.12 (compelling testimony). The federal courts' inherent supervisory powers are similarly circumscribed. *Williams*, *supra*, 504 U.S. at 46, 112 S. Ct. at 1741 (identifying Fed. R. Crim. P. 6 as the "few, clear rules" defining the scope of federal court authority over grand jury proceedings).

But nothing in those "few, clear rules" supersedes the jurisprudence of *Minor*/*Rice* in Kentucky or *Costello* in the federal courts. Despite the Justices' admitting to "our sometimes imprecise use of the term 'supervisory power[,]'" *United States v. Tsarnaev*, 595 U.S. 302, 326 n.*, 142 S. Ct. 1024, 1042, 212 L. Ed. 2d 140 (2022) (Barrett, J., concurring), the fact remains that no such powers provide *carte blanche* supervisory authority over either other courts or the independent grand jury. *Id.* The term only identifies for our trial courts "their inherent supervisory authority *over their own proceedings*." *Williams*, 504 U.S. at 55, 112 S. Ct. at 1746. "Their own proceedings" relative to a criminal prosecution do not begin until the court obtains jurisdiction over the grand jury's indictee to adjudicate his case.

It is true that every court has inherent supervisory powers. They are a manifestation of "the control vested in the court to manage *its own affairs* so as to achieve the orderly and expeditious, accurate and truthful disposition of causes and cases." *Potter v. Eli Lilly and Co.*, 926 S.W.2d 449, 453 (Ky. 1996), *abrogated on other grounds by Hoskins*, 150 S.W.3d 1 (emphasis added). "[T]his power 'ought

to be exercised with great caution' . . . restraint and discretion." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43, 44, 111 S. Ct. 2123, 2132, 115 L. Ed. 2d 27 (1991) (quoting *Ex parte Burr*, 9 Wheat. 529, 531, 6 L. Ed. 152 (1824)). "The extent of these powers must be delimited with care, for there is a danger of overreaching when one branch of the Government, without benefit of cooperation or correction from the others, undertakes to define its own authority." *Degen v. United States*, 517 U.S. 820, 823, 116 S. Ct. 1777, 1780, 135 L. Ed. 2d 102 (1996) (citing *Roadway Express, Inc. v. Piper*, 447 U.S. 752, 764, 100 S. Ct. 2455, 2463, 65 L. Ed. 2d 488 (1980)).

Fortunately, there is a simple test for determining whether a trial court exceeds or abuses that inherent supervisory authority no matter when or how it is exercised. The exercise of "inherent power must [1] be a reasonable response to a specific problem and [2] the power cannot contradict any express rule or statute[.]" *Dietz v. Bouldin*, 579 U.S. 40, 46, 136 S. Ct. 1885, 1892, 195 L. Ed. 2d 161 (2016) (brackets added for clarity).

In the case under review, the trial court's exercise of its inherent supervisory powers was not a reasonable response to any specific problem in this case. The court's foray into the grand jury proceedings was a departure from "*its own affairs*" in search of a problem the trial court presupposed. Our conclusion that this is a presupposed problem derives from the trial court's admission it has

"serious concerns over the way this case *and others* have been prosecuted . . . [over] its 15-year tenure on the bench . . . ." (TR 222–23) (emphasis added). That "specific problem" pre-existed Appellee's indictment and resides only in the mind of the trial judge. Use of inherent supervisory powers to address a judge's personal, extrajudicial concerns is not reasonable and, therefore, is an abuse of discretion. This is a failure to satisfy the first prong of the *Dietz* standard.

Additionally, the trial court's search for misconduct in the grand jury proceedings directly contradicted RCr 5.10 as *Minor/Rice* interprets it. That is legal error. The exercise of power here fails both prongs of the *Dietz* standard.

The trial court abused and exceeded its authority. Under the mere guise of supervisory authority, with no prompting by the parties, and disregarding the separation of powers, the trial court rejected the grand jury's independent decision to indict and encroached upon the prosecutor's duty to carry out a core Executive Branch function to prosecute that indictment. In doing so, the court abused its power in a way that reflects poorly on the judiciary as a whole.

*7.* Commonwealth v. Baker

The trial court's failure to recognize its own excess of power is traceable to its myopic reading of *Commonwealth v. Baker*, *supra*. The court boiled that deceptively complex case down to an overly simplistic summary, stating *Baker* "held that the trial court did not abuse its discretion when it

dismissed an indictment which was procured through misleading testimony." (TR 214 (citing *Baker*, 11 S.W.3d at 588)). With no jurisprudential context, such a statement implies deceptively broad authority for inquiring into grand jury proceedings and dismissing indictments. If only the trial court understood the context, many of the errors it committed never would have occurred. The *Baker* trial court did not violate *Minor/Rice*. This trial court did.

This Court of Appeals, like every appellate court, often puts the holdings of prior cases in its own words, with attribution. That attribution is there to provide context. Lawyers and judges who rely solely upon isolated words and phrases in an appellate court's opinion, without conducting at least some of the same research upon which they are based, risk representing the law out of context and adulterating our jurisprudence. This trial court did not read *Baker* closely enough even to recognize the defendant was the victims' mother.[30] That supports our belief that the trial court failed to read closely enough to understand its holding but, instead, plucked out-of-context snippets supporting its desired outcome. Here is a more complete account of *Baker*.

Earnestine Baker had "two daughters, ages 14 and 16," who "were arguing and fighting with each other." *Baker*, 11 S.W.3d at 586. She believed

---

[30] The trial court summarized *Baker* as follows: "[T]he prosecutor in *Baker* allowed a detective to testify to the grand jury that the defendant used a metal bat to beat the victim, when in fact *he* had used only a wooden stick." (TR 214) (emphasis added).

"she had a constitutional right to use reasonable corporal punishment to discipline her children[,]" *id.* at 587, and, "after they failed to heed her verbal command to stop, she struck each of the two girls with a wooden stick." *Id.* at 586. "[S]everal wooden sticks of various sizes" were secured by police as evidence. *Id.*

The prosecutor wanted to indict Mrs. Baker for "six felony counts of assault . . . [with] a deadly weapon or dangerous instrument" rather than simple assault. *Id.* at 587. But the investigating officer was unavailable to testify to the grand jury. So, the prosecutor asked his supervisor, Detective Jones, to fill in.

Detective Jones "had little knowledge about the case and merely relied on the prosecutor to provide the relevant information by answering his questions." *Id.* The prosecutor took advantage of that ignorance. Of the prosecutor's six substantive questions, two were whether "she struck her children with a baseball bat?" and whether "she acknowledged that she did strike her children about the body with an aluminum baseball bat?" *Id.* at 587 n.2. The truthful answer to both questions was, "No," but, presuming at the time that the prosecutor would not suborn a false answer, Detective Jones said, "Yes, sir." *Id.* Based on that false testimony, the grand jury issued the indictments the prosecutor sought—assault with a deadly weapon.

The trial court in *Baker* did not violate *Minor/Rice* by *sua sponte* looking behind the valid indictment as did the trial court in the instant case. The

-66-

false grand jury testimony came to light when, after the indictment issued and while under oath during the trial court's proceedings, Detective Jones risked charges of perjury against himself and "acknowledged that he had testified that Baker struck her children with an aluminum baseball bat, but conceded that there was no evidence that a baseball bat was used." *Id.* at 587.[31] Jones could reveal his grand jury testimony despite Kentucky's rule requiring the secrecy of those proceedings, RCr 5.24,[32] because while the prohibition against "disclosing the testimony of another witness remains enforceable . . . ," the rule conflicts with a grand jury witness's superior "First Amendment right to make a truthful statement of information he acquired on his own." *Butterworth v. Smith*, 494 U.S. 624, 633, 636, 110 S. Ct. 1376, 1382, 1383, 108 L. Ed. 2d 572 (1990).

---

[31] We included the following footnote in *Baker*:

> The trial court cited *Commonwealth v. Stallard*, Ky., 958 S.W.2d 21 (1997), in determining the legal effect of Detective Jones's testimony. *Stallard*, however, involved the statutory offenses of perjury and false swearing by a witness before a grand jury. Although the court's criticism of Detective Jones's appearance before the grand jury without adequate knowledge of the case is appropriate, the record does not support its finding that Jones *knowingly* gave false testimony and committed perjury.

*Baker*, 11 S.W.3d at 589 n.14 (emphasis original).

[32] In pertinent part, the rule says: "all persons present during any part of the proceedings of a grand jury shall keep its proceedings and the testimony given before it secret" and violating the rule "shall be punishable as a contempt of court." RCr 5.24(1), (3).

The prosecutor who suborned Detective Jones's false answers did not appear before the trial court to defend his actions. He was already "suspended from the practice of law following his conviction in the United States District Court for the Eastern District of Kentucky of the crime of Interference with Commerce by Threat involving the extortion of money from a defendant he was prosecuting." *Baker*, 11 S.W.3d at 590 n.15.

When this Court decided *Baker*, we were writing on a blank slate, at least to the extent there were "no Kentucky cases directly on point[.]" *Id.* at 589. We turned to federal authority, especially to *Bank of Nova Scotia*, *supra*.

Nothing in the record suggests the trial court read *Bank of Nova Scotia*. The procedural history of that federal opinion reveals how the federal version of *Minor/Rice* (expressed fundamentally in *Costello*, *supra*) remains unaffected by the standard it recognized for assessing prosecutorial misconduct before the grand jury.

Concomitantly, *Baker* did not dilute *Minor/Rice* or affect its application in any way because this Court followed *Bank of Nova Scotia*. Our analysis in *Baker* and the rule of *Minor/Rice* remain in harmony. But one will not understand that by a cursory reading of *Baker*, or without reading the federal jurisprudence upon which it is based, starting with *Bank of Nova Scotia*.

*8.* Bank of Nova Scotia v. United States

*Baker* and *Bank of Nova Scotia* have two noteworthy characteristics in common. The first is important to this case in particular—neither opinion suggested it was somehow proper for a trial court, *sua sponte*, to undertake a search for prosecutorial misconduct by looking behind a valid indictment and into secret grand jury proceedings.

Second, neither trial court examined those staunchly secretive proceedings until after: (1) the defendant presented overwhelming proof of misconduct not gained from the grand jury proceedings themselves, and (2) the trial court made a preliminary finding that such evidence justified looking behind the indictment notwithstanding the respective rules in *Costello* and *Minor/Rice*.[33] These are merely the first steps in justifying and authorizing a look behind a valid indictment to see if a motion to dismiss may be entertained by the trial court.

As explained, the misconduct in *Baker* came to light without divulging grand jury testimony in violation of RCr 5.24.[34] In *Bank of Nova Scotia*,

---

[33] *Bank of Nova Scotia* does not describe the procedure followed by the federal trial court. Its tacit approval and use is obvious from the fact the trial court followed Fed. R. Crim. P. 6(e)(3)(E)(ii). *See*, footnote 38, *infra*, (showing the procedure followed was also approved when the Government challenged it in the Tenth Circuit). Neither does *Baker* explain each step of the procedure its trial court must have followed when it adopted this procedure. One must read *Bank of Nova Scotia*'s entire history to understand the procedure. For that reason, we explain it in this Opinion.

[34] In the instant case, Appellee's counsel could divulge Detective Boyd's grand jury testimony privately, for example to his client, in preparation for trial. RCr 5.24(1). However, he also divulged it to the world in his unsealed reply to the Commonwealth's response to his motion to

-69-

it was allowed pursuant to an express federal grand jury rule, Rule 6(e)(3)(C)(ii).[35]

*United States v. Kilpatrick*, 575 F. Supp. 325, 339 (D. Colo. 1983).  Kentucky has

no corollary to this specific rule.

The ultimate ruling in *Bank of Nova Scotia* came about by way of

"convoluted proceedings" that yielded multiple opinions.  *Blondin v. Winner*, 822

F.2d 969, 971 (10th Cir. 1987).  *Blondin* is one such opinion.  *Kilpatrick*, *supra*, is

another.  The district court rendered *Kilpatrick* after the Tenth Circuit Court of

---

dismiss in violation of the same rule.  He might have been sanctioned for contempt.  RCr 5.24(3) ("A violation of this Rule 5.24 shall be punishable as a contempt of court.").  He was not.

Although RCr 5.16(3) says, "any person indicted by the grand jury shall have a right to procure a transcript" of its proceedings, that is not a general waiver of the requirement of RCr 5.24 to maintain its secrecy.  "[T]he grand jury transcript may be of assistance to defense counsel in the preparation of his case.  Also, it may be used in contradicting witnesses on the trial where they have appeared before the grand jury."  *Chinn v. Commonwealth*, 310 S.W.2d 65, 67 (Ky. 1957) (citing *Summers v. Commonwealth*, 33 S.W.2d 594, 596 (Ky. 1930)).  Consistent with *Chinn*, the rule allows that both prosecution and defense "counsel may divulge such information as may be necessary in preparing the case for trial or other disposition."  RCr 5.24(1).  Although secrecy is not absolute, it remains forever carefully guarded. 8 KY. PRAC. CRIM. PRAC. & PROC. § 10:24, *Grand Jury Secrecy* (6th ed. Nov. 2025 update).  Our highest court gave a best-practice example in *Summers*:

> counsel should not simply hand to the witness the copy of the transcript and ask the witness to read it and say if he gave that testimony.  The cross-examination should be confined to questions and answers inconsistent with his testimony on the trial on which the counsel expects to contradict the witness.  The evidence is only competent to lay the foundation for the contradiction of the witness and should go no farther.

*Summers*, 33 S.W.2d at 596.

[35] After *Kilpatrick* was rendered, the rule was renumbered without change as Fed. R. Crim. P. 6(e)(3)(E)(ii).  We cite the rule by its current number hereafter.

Appeals remanded the case to determine whether prosecutorial misconduct affected the grand jury's decision to indict. *Blondin*, 822 F.2d at 972.

The Tenth Circuit's mandate did not instruct the district court to simply look behind the indictment and assess the prosecutor's conduct, an act as forbidden in federal courts as in our own. The district court knew that when the purpose is to determine whether prosecutorial misconduct influenced the grand jury, the only key to unlocking its secret proceedings is Rule 6(e)(3)(E)(ii).

Rule 6(e)(3)(E)(ii) says, "disclosure of grand jury matters may be made 'when permitted by the court at the request of the defendant, *upon a showing* that grounds may exist for a motion to dismiss the indictment because of matters occurring before the grand jury.'" *Kilpatrick*, 575 F. Supp. at 339 (emphasis added). Thus, to authorize a look behind a facially valid indictment and the disclosure of grand jury proceedings, the federal defendant must make a "*preliminary* factual showing of serious misconduct" and that must be established to the court's satisfaction, obviously, *other than by the grand jury transcript itself*. *Id.* (quoting Adv. Comm. Notes to 1979 amendments to Fed. R. Crim. P. 6) (emphasis added).

The serendipity of federal District Judge Winner's imminent retirement when he authored *Kilpatrick* demonstrates clearly this is a two-step process. Judge Winner decided only whether the defendant presented enough

evidence to justify breaching the secrecy of the grand jury proceedings. *Id.* at 340. He never looked at those proceedings. "[F]urther hearings [we]re essential to a ruling on the motions to dismiss," said the retiring judge. *Id.* at 340. "I make no ruling on and I intimate no belief as to what should be done with the dismissal motions. This decision will have to be made by Judge Kane[.]" *Id.* Only after Judge Winner completed the first of the two steps of this procedure did Judge Kane look behind the indictment.

We recognize "for defendants whose cases involve [allegations of] prosecutorial misconduct [before the grand jury], the general rule of grand jury secrecy will make it difficult" to satisfy this first step. *Use of supervisory power—Supervisory power in federal cases—Supervisory power cases involving prosecutorial misconduct*, GRAND JURY LAW AND PRACTICE § 9:32 (2d ed. Dec. 2025 update) (footnote omitted). "The net effect of . . . *Bank of Nova Scotia* is to make it extremely difficult, though not impossible, to get an indictment set aside even if there has been egregious prosecutorial misconduct before the grand jury." Others go further: "This is a virtually impossible standard to meet . . . ." Niki Kuckes, *The Useful, Dangerous Fiction of Grand Jury Independence*, 41 AM. CRIM. L. REV. 1, 66 n.107 (2004).

But the burden is great for a reason. The reason is a bedrock principle of our justice system we already addressed—the independence of the grand jury.

Just as our own Supreme Court recently made it clear that *Minor/Rice* remains a

necessary principle of our jurisprudence, *Shelton*, *supra*, at *5, the drafters of the

amendments to federal Rule 6 made it clear the addition of Rule 6(e)(3)(E)(ii) was:

> not intended to make any change regarding whether a defendant may challenge a grand jury indictment. . . . Nor are the changes intended to permit the defendant to challenge the conduct of the attorney for the government before the grand jury absent a preliminary factual showing of serious misconduct.

Fed. R. Crim. P. 6, Advisory Committee Notes (citing *Costello*, *supra*).

Even after the *Kilpatrick* district court found adequate evidence to

look behind the indictment, it took every available precaution to maintain the

remaining secrecy of those grand jury proceedings, as compelled by *Costello* and

as described in the Advisory Committee Notes to Rule 6, by strict instructions for

handling the transcript.[36]  *Kilpatrick*, 575 F. Supp. at 339.  Rule 6(e)(3)(E)(ii) did

---

[36] In addition to ordering that "[a]ll briefs disclosing grand jury testimony shall be sealed[,]" the full instructions for maintaining secrecy further included the following:

> Disclosure shall be made to counsel and only to counsel.  Paralegals shall not be used as substitute lawyers, and only members of the bar shall examine the transcript.  They shall hold secret matters they learn, and they shall discuss them with no one other than co-counsel, and, insofar as necessary to the preparation of their arguments, with their clients.  Typists given direct or indirect information concerning the content of the transcript shall receipt for a copy of a written order commanding that they hold secret any information learned by them as to what took place before the grand jury, and those receipted orders shall be filed with the clerk.  During the time a transcript is being used to prepare arguments in this case, counsel shall be personally responsible for its secrecy, and when not in actual use, the transcript shall be placed in locked storage to which only counsel have access.

not weaken *Costello*'s protection of the grand jury's independence or the secrecy of its proceedings.  Nor did *Baker* weaken *Minor/Rice*.

It is manifestly unavoidable that once *Baker* adopted the federal approach, the only way to maintain fidelity to *Minor/Rice*, and grand jury independence and secrecy, is to follow the *Bank of Nova Scotia* procedure just as strictly as the federal courts do.

9.  Baker *adopted* Bank of Nova Scotia *procedure into Kentucky jurisprudence.*

Given the procedure the trial judge followed in *Baker*, and with a full understanding of the federal guidance this Court followed when reviewing the order dismissing the indictment, there should be no doubt *Baker* adopted *Bank of Nova Scotia*'s two-step federal procedure despite Kentucky not having an express corollary to Rule 6(e)(3)(E)(ii) from which that federal procedure derives. *Compare* Fed. R. Crim. P. 6–9 *with* RCr 5.02 to RCr 6.56.

Each step of the procedure has its own legal standard and consists of two parts.  The trial court in our case ignored all four parts.  To avoid future miscues, we break down this procedure that was necessarily followed in *Baker* in order that it harmonize with Kentucky jurisprudence, especially *Minor/Rice*.

---

When need for the transcripts no longer exist, all copies of it shall be returned to the United States Attorney to remain in his custody and control.

*Kilpatrick*, 575 F. Supp. at 339.

The first part of step one requires the defendant to make a "*showing that grounds may exist* for a motion to dismiss the indictment because of matters occurring before the grand jury." *United States v. John Doe, Inc. I*, 481 U.S. 102, 108 n.2, 107 S. Ct. 1656, 1660, 95 L. Ed. 2d 94 (1987) (emphasis added) (quoting Rule 6(e)(3)(E)(ii)). That is, a defendant cannot go straight to the filing of a motion to dismiss for prosecutorial misconduct by divulging secret grand jury proceedings in violation of RCr 5.24. He must satisfy this predicate by a showing of serious misconduct without violating that rule.[37] Earnestine Baker satisfied this first part of the first step when Detective Jones testified in open court.

The second part of step one is for the trial court. Exercising proper discretion, the court may or may not find the defendant's showing justifies breaching the secrecy of the grand jury's proceedings. But if what the defendant presents is no more than a challenge to the indictment's evidentiary basis, the showing will not be enough. *Isham*, 98 S.W.3d at 62 ("not the province of a trial judge to evaluate evidence in advance in order to decide whether a trial should be held"). *See also* footnotes 24–27, *supra*. The trial court abuses its discretion by finding otherwise. Earnestine Baker's showing was more than enough.

---

[37] Appellee was not pursuing a claim of prosecutorial misconduct under the *Bank of Nova Scotia* procedure when he quoted Detective Boyd's grand jury testimony in his reply to the Commonwealth's response to his motion to dismiss for lack of evidence of probable cause. Nevertheless, that was a violation of RCr 5.24. *See*, footnote 34, *supra*.

Detective Jones's testimony in *Baker* did not just reveal his own false testimony. It proved "the government kn[e]w the evidence was perjured" and this is critical. *Baker*, 11 S.W.3d at 588–89 (quoting *United States v. Roth*, 777 F.2d 1200, 1204 (7th Cir. 1985)). "What makes the government's knowing use of perjured testimony different is that it involves an element of deceit, which converts the issue from the adequacy of the indictment's evidentiary basis to fraudulent manipulation of the grand jury that subverts its independence." *Id.* at 589. The detective's testimony satisfied this standard of a "*preliminary* factual showing of serious misconduct[,]" and did so without disclosing grand jury proceedings. *See Kilpatrick*, 575 F. Supp. at 339 (emphasis added) (citation omitted).

"RCr 5.24(1) mandates that the evidence heard [by the grand jury] remain secret, except where otherwise approved, *in appropriate situations*, by the trial court." *Fletcher*, 192 S.W.3d at 408 n.3 (emphasis added). The *Baker* trial court found these unique circumstances presented such an "appropriate situation" that satisfied the "virtually impossible standard." Kuckes, *supra*, at page 66 n.107. That finding allowed the dismissal motion to proceed, and authorized the trial court to look behind the facially valid indictment to see if that motion might succeed.

This Court found no abuse of discretion in the *Baker* trial court's finding that Detective Boyd's testimony alone was sufficient evidence of the prosecutor's deceit of the grand jury to authorize looking behind the indictment.

-76-

That satisfied the second part of the procedure's first step consistently with the federal procedure described above from *Bank of Nova Scotia*'s history.[38] That takes us to step two.

After the *Baker* trial court considered the additional evidence revealed by the then-authorized look behind the indictment confirming Detective Jones's testimony, it could entertain Baker's motion to dismiss the indictment by applying the separate standard applicable in step two. SCOTUS states that standard as follows: "dismissal of the indictment is appropriate only 'if it is established that the violation substantially influenced the grand jury's decision to indict,' or if there is 'grave doubt' that the decision to indict was free from the substantial influence of such violations." *Bank of Nova Scotia*, 487 U.S. at 256, 108 S. Ct. at 2374 (quoting *United States v. Mechanik*, 475 U.S. 66, 78, 106 S. Ct. 938, 945–46, 89 L. Ed. 2d 50 (1986) (O'Connor, J., concurring)).

In *Baker*, the trial court concluded the prosecutor's suborning of Detective Jones's false testimony before the grand jury "affected the grand jury's

---

[38] Judge Winner found "more than an adequate showing[.]" *Kilpatrick*, 575 F. Supp. at 339 (internal quotation marks omitted). The Supreme Court identified that showing as "various violations of Federal Rule of Criminal Procedure 6 . . . , violations of 18 U.S.C. §§ 6002 and 6003, violations of the Fifth and Sixth Amendments to the United States Constitution, knowing presentation of misinformation to the grand jury and mistreatment of witnesses." *Bank of Nova Scotia*, 487 U.S. at 253, 108 S. Ct. at 2372. When the Government pursued relief from Judge Winner's order, the Tenth Circuit ruled "the district court order is not appealable and that petitioners have not shown that they are entitled to an extraordinary writ." *Blondin*, 822 F.2d at 971. The Supreme Court of the United States denied *certiorari*. *Blondin v. Winner*, 484 U.S. 1006, 108 S. Ct. 699, 98 L. Ed. 2d 650 (1988).

decision whether to indict on the assault charge, which required the use of a deadly weapon." 11 S.W.3d at 588. There was no deadly weapon, and the prosecutor knew it. He was not pursuing any lesser charge. The grand jury's choice was to indict or not to indict at all. The prosecutor's deceit "substantially influenced the grand jury's decision to indict" on his preferred charge of second-degree assault. *Id.* at 587. But that is only the first part of step two.

Step two requires the defendant to convince the trial court of both parts of the standard—both "that the defendant show both a flagrant abuse of the process *and actual prejudice*[.]" *Id.* at 588 (emphasis added). Even if "the indictment would not have been issued except for" the prosecutor's flagrant misconduct, the procedure's second part of the second step "confines judicial intervention to cases of *prejudicial* misconduct, that is, to cases where the misconduct made a difference to the defendant." *Id.* at 589 (quoting *Roth*, 777 F.2d at 1204) (emphasis added).

This second part of step two should surprise no one. Actual prejudice is a cardinal element of prosecutorial misconduct no matter when it is alleged to have occurred. "[T]he Court must view that allegation *in the context of the overall fairness of the trial . . .* [and] the Commonwealth's misconduct must be so serious as to render the entire *trial* fundamentally unfair." *Murphy v. Commonwealth*, 509 S.W.3d 34, 49 (Ky. 2017) (emphasis added) (internal quotation marks and citations

omitted). Prosecutorial conduct falling short of that standard is harmless and will not survive harmless error review. *See Robinson v. Commonwealth*, 647 S.W.3d 136, 143 (Ky. 2022).

Harmless error review of prosecutor conduct applies no differently in the federal courts. In fact, the Supreme Court of the United States saw the district court's dismissal of the indictment in *Bank of Nova Scotia* as a wrongful attempt to "invoke supervisory power to circumvent the harmless-error inquiry[.]" *Bank of Nova Scotia*, 487 U.S. at 254, 108 S. Ct. at 2373. The Supreme Court put a stop to the attempt with aplomb, stating:

> In *United States v. Mechanik*, 475 U.S. 66, 106 S. Ct. 938, 89 L. Ed. 2d 50 (1986), we held that there is "no reason not to apply [Rule 52(a)[39]] to 'errors, defects, irregularities, or variances' occurring before a grand jury just as we have applied it to such error occurring in the criminal trial itself." *Id.*, at 71–72, 106 S. Ct., at 942. In *United States v. Hasting*, 461 U.S. [499], at 506, 103 S. Ct. [1974], at 1979, [76 L. Ed. 2d 96 (1983)] we held that "[s]upervisory power to reverse a conviction is not needed as a remedy when the error to which it is addressed is harmless since, by definition, the conviction would have been obtained notwithstanding the asserted error." We stated that deterrence is an inappropriate basis for reversal where "means more narrowly tailored to deter objectionable prosecutorial conduct are available." *Ibid.* We also recognized that where the error is harmless, concerns about the "integrity of the [judicial] process" will

---

[39] "Rule 52(a)," which the Supreme Court added in brackets, is Fed. R. Crim. P. 52(a) which states: "**Harmless Error.** Any error, defect, irregularity, or variance that does not affect substantial rights must be disregarded." Although Kentucky's harmless error rule is longer, it includes nearly identical language, as follows: "The court at every stage of the proceeding must disregard any error or defect in the proceeding that does not affect the substantial rights of the parties." RCr 9.24.

carry less weight, *ibid.*, and that a court may not disregard the doctrine of harmless error simply "in order to chastise what the court view[s] as prosecutorial overreaching." *Id.*, at 507, 103 S. Ct., at 1979. Unlike the present cases, . . . *Hasting* involved constitutional error. It would be inappropriate to devise a rule permitting federal courts to deal more sternly with nonconstitutional harmless errors than with constitutional errors that are likewise harmless.

*Bank of Nova Scotia*, 487 U.S. at 255–56, 108 S. Ct. at 2374.

In *Baker*, this Court found no abuse in the trial court's finding that Mrs. Baker was prejudiced. That satisfied the second part of the procedure's second step.[40] It is this second part of step two where *Baker* departed from *Bank of Nova Scotia*.

---

[40] With the benefit of greater insight into this line of federal jurisprudence as it evolved since *Bank of Nova Scotia*, one might be tempted to criticize *Baker* on this point of prejudice. In fact, we concluded "there is no indication that the prosecuting attorney's action irrevocably tainted the evidence or would prejudice Baker's case upon trial." *Baker*, 11 S.W.3d at 591. We also said nearly all misconduct before the grand jury is "generally curable." *Id.* at 590 (citation omitted). Obviously, it would have been cured at trial when the defense called Detective Boyd to testify. And we also recognized that SCOTUS:

cautioned courts to identify and then neutralize the taint [of prosecutorial misconduct] by tailoring relief appropriate in the circumstances. . . . The Court in *Bank of Nova Scotia* [having] noted several alternative remedies other than dismissal of an indictment available for prosecutorial misconduct including punishment for contempt of court, chastisement in a published opinion, or bar or agency disciplinary action.

*Id.* at 591. Nevertheless, we found what might be considered middle ground by "revers[ing] that portion of the order dismissing the indictment with prejudice" and allowing reindictment. *Id.* Even today, however, we see both compliance with the federal procedure and justice in the ultimate outcome. Given the unique circumstances of Earnestine Baker's case, including the effect on the reputation of the particular Commonwealth's Attorney's office, voluntary dismissal seemed more likely than a successor prosecutor forcing Mrs. Baker to endure a trial destined to result in acquittal.

10. *Analysis applied in* Bank of Nova Scotia *applies here.*

In *Baker*, we affirmed dismissal.[41]  Not so in *Bank of Nova Scotia*, nor for that matter, in any federal opinion we researched.  The analysis of the prejudice element in *Bank of Nova Scotia* is more to the point of this appeal than is *Baker*.

The Tenth Circuit Court of Appeals did not affirm Judge Kane's dismissal despite his conduct of a ten-day evidentiary hearing about prosecutorial misconduct, including what the grand jury transcript revealed.  The intermediate appellate court emphasized the impermeability of the grand jury proceedings and the assurance of its independence by rules of secrecy:

> We remain convinced that the drastic remedy of dismissal of an indictment, whether premised on due process or supervisory powers theories, cannot be exercised without a significant infringement on the grand jury's ability to exercise independent judgment.  We are instructed . . . to ignore errors that are harmless, including most constitutional violations.

*United States v. Kilpatrick*, 821 F.2d 1456, 1475 (10th Cir. 1987), *aff'd sub nom. Bank of Nova Scotia*, 487 U.S. 250, 108 S. Ct. 2369.

---

That satisfied the prejudice element for us.  If she was ever reindicted, and if there was a trial, there was never an appeal to this Court or to Kentucky's highest court.

[41] The Court affirmed dismissal, reversing only so much of the order as dismissed with prejudice. *Baker*, 11 S.W.3d at 591.

The Supreme Court of the United States agreed, focusing on the requirement that there be actual prejudice to the defendant, and stating:

> We conclude that the District Court had no authority to dismiss the indictment on the basis of prosecutorial misconduct absent a finding that petitioners were prejudiced by such misconduct. . . . The record will not support the conclusion that petitioners can meet this standard. The judgment of the Court of Appeals is affirmed.

*Bank of Nova Scotia*, 487 U.S. at 263–64, 108 S. Ct. at 2378.

## **Misapplication of the Prosecutorial Misconduct Jurisprudence**

As stated, the trial court here followed no part of the procedure *Baker* adopted. Appellee made no showing at all much less one that would satisfy the procedure's first part of its first step. The second part of step one could not have been followed because the trial court acted *sua sponte* without consideration of any such necessary showing. We turn our focus then to the trial court's errors relative to step two.

11. *Trial court erred as a matter of law by implicitly finding the prosecutor's conduct deprived the grand jury of autonomous and unbiased judgment.*

The grand jury was told Appellee ran a red light using a left turn lane to go straight at more than 95 miles per hour, struck a vehicle, killed the driver by severing her body, and fled the scene. "All of this information was accurate and unbiased[,]" said the trial court. (TR 206). As a practical matter, we must take

leave of our own senses to believe those facts alone would not have been enough to indict Appellee even if the prosecutor engaged in misconduct of the sort described in all the federal cases cited in this Opinion. What Appellee presents for review is nothing comparable to what Earnestine Baker presented, "which is an apt description of the hypothetical case" Judge Posner imagined in *Roth*, *supra*,—"the prosecutor's hoking up a completely phony case before the grand jury[.]" *Roth*, 777 F.2d at 1205 (cited in *Baker*, 11 S.W.3d at 588).

What this trial court erroneously surmised must have deceived the grand jury to indict was what the prosecutor omitted. The court said the Commonwealth failed to provide the grand jury with "a full description" of the accident scene, (TR 207), and "fail[ed] to give the grand jury . . . all of the relevant evidence." (TR 224). But if the trial judge had read the appropriate rule as *Minor/Rice* defines it, she would have known "no indictment shall be quashed . . . on the ground that there was not sufficient evidence before the grand jury to support the indictment." RCr 5.10. *See also* footnote 29, *supra*.

Mischaracterizing *Baker*, the trial court also indicated the indictment "was procured through misleading testimony," an odd way to describe what amounts to an accusation the prosecutor withheld exculpatory evidence. (TR 214). The trial court said:

> [T]he grand jury was presented with testimony that [Appellee] intentionally "avoided collision prior to the

intersection" by "going around stopped traffic at the red light."   In reality, there is no evidence that [Appellee] made a conscious choice to change lanes in order to avoid stopped traffic in front of him.   The only definitive evidence is that [Appellee] ran a red light at high speed while experiencing a psychotic break.

(TR 224).  In other words, in addition to not providing all relevant evidence, the trial court found the prosecutor deceived grand jurors by not providing them with exculpatory evidence that Appellee lacked *mens rea* at the time of the accident. There are two absolute disqualifiers of such rationale, one factual and one legal.

Factually, it is preposterous to suggest the prosecutor had a duty to inform the grand jury of Appellee's incapacity to make a "conscious choice" when Appellee did not even assert that defense until two years after the indictment.

Legally, the trial court could not be further off base.  The trial court's belief about what prosecutors must present to a grand jury mirrors what the respondent urged in *Williams*, *supra*.  Referencing Rule 6 which includes the federal corollary to RCr 5.10, the Supreme Court of the United States refused to accept its respondent's and our trial court's view, stating:

> Respondent insists . . . that courts must require the modern prosecutor to alert the grand jury to the nature and extent of the available exculpatory evidence, because otherwise the grand jury "merely functions as an arm of the prosecution."  Brief for Respondent 27.  We reject the attempt to convert a nonexistent duty of the grand jury itself into an obligation of the prosecutor.  The authority of the prosecutor to seek an indictment has long been understood to be "coterminous with the authority of the

grand jury to entertain [the prosecutor's] charges." *United States v. Thompson*, [251 U.S. 407, 414, 40 S. Ct. 289, 292, 64 L. Ed. 333 (1920).] If the grand jury has no obligation to consider all "substantial exculpatory" evidence, we do not understand how the prosecutor can be said to have a binding obligation to present it.

*Williams*, 504 U.S. at 53, 112 S. Ct. at 1745.

*Williams* went on to say if a prosecutor had to "present exculpatory as well as inculpatory evidence" it "would alter the grand jury's historical role, transforming it from an accusatory to an adjudicatory body." *Id.* at 51, 112 S. Ct. at 1744. Our own Supreme Court takes the identical view. *Skinner v. Commonwealth*, No. 2019-SC-0589-MR, 2021 WL 732963, at *7, *7 nn. 38, 39 (Ky. Feb. 18, 2021) (citing *Baker*, 11 S.W.3d at 591 (quoting *Williams*, 504 U.S. at 51, 112 S. Ct. at 1744 and *Rice*, 387 S.W.2d at 5 ("The grand jury proceeding is not a trial . . . [and t]he grand jury is merely required to find an indictment where they [sic] have received what they believe to be sufficient competent evidence to support it."); and citing RCr 5.10)).

It is thus beyond dispute that failing to present to a grand jury the evidence the trial court believes should have been presented, whether to give a more complete picture or to exculpate the grand jury's target, is not prosecutorial misconduct as a matter of law. *Baker*, 11 S.W.3d at 588 (citing RCr 5.10). The trial court committed legal error by saying it is.

12. *Trial court abused its discretion by "invoking supervisory powers to circumvent the harmless-error inquiry" as occurred in* Bank of Nova Scotia.

The trial court acknowledged "no one specific action of the Commonwealths Attorney's office, taken by itself, is prejudicial enough to warrant dismissal[.]" (TR 224). Rather, the court stated it took the combination of pre- and post-indictment conduct to find prejudice. As explained above, we are satisfied there was no prosecutorial misconduct before the indictment issued. Removing pre-indictment conduct from the court's calculus would necessarily eliminate the element of prejudice and justify reversal.

However, we cannot fail to reproach the trial court for finding any degree of prejudice in the prosecutor's post-indictment "decision to proceed forward with a murder charge despite having no evidence to contradict that the Defendant was suffering a psychotic break[.]" (*Id.*) (parentheses omitted).

The primary reason the law concerns itself with prosecutorial misconduct is its potential for impacting a defendant's right to a fair trial.[42] This

---

[42] The law's secondary concern with prosecutorial misconduct—correcting or sanctioning an officer of the court—is primarily the responsibility of the bar association. *See Boling v. Kentucky Bar Association*, 677 S.W.3d 369, 372 (Ky. 2023) (Commonwealth's Attorney disciplined for, among other things, "prosecuting a charge that the prosecutor knows is not supported by probable cause."). Sometimes, the criminal justice system itself takes on that responsibility. *See Baker*, 11 S.W.3d at 590 n.15.

trial court seems motivated otherwise than assuring a fair trial.[43]  There is no basis for any reasonable belief the prosecutor's actions either after the indictment or before the grand jury, or even taken altogether, prejudiced Appellee's right to a fair trial.  Whatever remote impact those actions might have had is easily remediable and practically automatically so.

Whatever evidence the trial court deemed lacking before the grand jury, defense counsel would have been able to offer into evidence at trial, presuming of course he agreed with the trial court that such evidence supported one of his defenses.  By the current record, Appellee has announced only one defense—his insanity at the time of the accident.  If prosecutorial misconduct will be a part of Appellee's defense should this case reach trial, that will be up to him after conferring with his counsel.

Our courts assess any allegation of prosecutorial misconduct, including a trial court's *sua sponte* allegation, by its prejudicial effect on the petit

---

[43] With no proof we could discern, the court ascribed improper motives for the perceived misconduct, claiming the prosecutor "deci[ded] to press on with the charges . . . in order to obtain greater leverage in plea negotiations[.]" (TR 225–26).  The court predicted that, in a trial, the Commonwealth could not secure a conviction "without misleading a jury[.]"  (TR 226).  Furthermore, the trial court expressed disappointment that the Fayette Commonwealth Attorney "does not appear to have altered its conduct" in response to an independent report by the Fayette County Commission for Racial Justice and Equality of which the trial court had extra-judicial knowledge and which the court lauded in its order.  (TR 212–13).  Regardless, the finding of prosecutorial misconduct here is not based on any proof or reasonable presumption that the prosecutor's conduct compromised Appellee's ability to obtain a fair trial.

jury decision-making. We ask whether the prosecutor's conduct prejudices the defendant's chance of success at trial. It did not here.

No matter the outcome on appeal, the prosecutor undoubtedly will continue to pursue prosecution because the case was dismissed without prejudice. If that were not so, this appeal would not be happening.

Ironically then, it is not the prosecutor's conduct, but the trial court's indulgent *sua sponte* assailing of the prosecutor without legal or factual basis that prejudices Appellee. "[U]nreasonable delay between formal accusation and trial threatens to produce more than one sort of harm[.]" *Goben v. Commonwealth*, 503 S.W.3d 890, 907 (Ky. 2016) (citations to SCOTUS opinions and internal quotation marks omitted). In addition to "anxiety and concern of the accused," there is "the possibility that the [accused's] defense will be impaired by dimming memories and loss of exculpatory evidence . . . , [and o]f these forms of prejudice, the most serious is the last . . . ." *Id.*

In summary, the two-part procedure adopted from the federal system in *Baker* safeguards Kentucky's fidelity to the grand jury system, to its independence, and to the secret nature of its proceedings. The procedure will continue to do so only if the procedure is followed strictly. It was followed in *Baker*. Because Appellee presents nothing akin to the circumstances in *Baker*, that

case is manifestly not applicable here. The trial court erred by dismissing the indictment on the belief that it was.

We cannot affirm based on the trial court's *sua sponte* dismissal of the indictment for prosecutorial conduct.

**C. *Sua Sponte* Dismissal for Selective Prosecution Was Founded on Numerous Legal Errors and Abuses of Discretion.**

The trial court did not limit itself to only one *sua sponte* adventure into this case. Without prompting of any kind, the court explored its own pre-conceived belief that the Fayette Commonwealth's Attorney routinely selectively prosecutes people of color with greater frequency and fervor than it prosecutes Caucasians. Not only does the record fail to support such a belief, the trial court's method of self-affirming it is more than unorthodox. It disregards and degrades the only recognized, constitutionally sound procedure we know.

Everything we identified in Section III.B. as errors and abuses relative to *sua sponte* court action and the limits of supervisory authority apply equally to the trial court's pursuit of a selective-prosecution claim. That alone could be enough to reverse the trial court's selective-prosecution ruling.

Again, however, to avoid a repetition of the reversible errors specific to this basis for dismissal, we address the trial court's equally unsophisticated understanding of selective-prosecution jurisprudence. We begin by examining the

-89-

bellwether for selective-prosecution allegations, *United States v. Armstrong*, 517

U.S. 456, 116 S. Ct. 1480, 134 L. Ed. 2d 687 (1996).

Kentucky jurisprudence barely mentions that thirty-year-old lodestar

opinion.[44]  Elucidating *Armstrong* for our courts' guidance is well overdue.

1. United States v. Armstrong *establishes a near insurmountable barrier to a claim of selective prosecution.*

An allegation of selective prosecution, no matter who makes it, tests

the authority of a court "to challenge an exercise of one of the core powers of the

Executive Branch . . . , the power to prosecute."  *Id.* at 467, 116 S. Ct. at 1487.

---

[44] *Armstrong* has been cited in only nine (9) Kentucky opinions.  The argument for selective prosecution/selective enforcement failed in each case.  Only one of those opinions is published, *Williams v. Commonwealth*, 213 S.W.3d 671 (Ky. 2006).  That opinion adds nothing to our understanding of *Armstrong* or selective prosecution, stating, in its entire context:

> Appellant contends his convictions and sentence were the result of (1) selective prosecution on account of race in violation of the Fourteenth Amendment of the U.S. Constitution; and (2) racial profiling in violation of KRS § 15A.195.  Upon careful review of the record, we find no error on the part of the trial court in finding that Appellant failed to carry his burden to prove either of these claims. *See United States v. Armstrong*, 517 U.S. 456, 465, 116 S. Ct. 1480, 134 L. Ed. 2d 687 (1996).

*Id.* at 685.  The unpublished opinions are: *Hardy v. Commonwealth*, No. 2016-SC-000602-MR, 2017 WL 6379445 (Ky. Dec. 14, 2017) (selective prosecution); *Coleman v. Beshear*, No. 2022-CA-0837-MR, 2024 WL 875611 (Ky. App. Mar. 1, 2024), *review granted* (Feb. 13, 2025) (unrelated to selective prosecution or enforcement); *Runyon v. Commonwealth*, No. 2007-CA-002207-MR, 2008 WL 4683216 (Ky. App. Oct. 24, 2008) (selective prosecution); *Hearld v. Commonwealth*, No. 2005-CA-002112-MR, 2006 WL 2924066 (Ky. App. Oct. 13, 2006) (cited for point not directly related to selective prosecution or enforcement); *Thomas v. Motley*, No. 2004-CA-000605-MR, 2005 WL 2174616 (Ky. App. Sep. 9, 2005) (selective enforcement of prison rules); *Ibarra Miranda v. Commonwealth*, No. 2004-CA-000365-MR, 2005 WL 791176 (Ky. App. Apr. 8, 2005) (selective enforcement/selective arrest); *Holsey v. Commonwealth*, No. 2003-CA-000018-MR, 2004 WL 2914750 (Ky. App. Dec. 17, 2004) (unsuccessfully arguing ineffective assistance of counsel for failing to raise selective prosecution); and *Dees v. Commonwealth*, No. 2003-CA-001737-MR, 2004 WL 2567152 (Ky. App. Nov. 12, 2004) (unsuccessfully arguing ineffective assistance of counsel for failing to raise selective enforcement/selective arrest).

The allegation "asks a court to exercise judicial power over a 'special province' of the Executive." *Id.* at 464, 116 S. Ct. at 1486. The obvious risk is the judiciary's breaching of the separation of powers. The potential for harm, should such a breach happen, is equally obvious:

> Examining the basis of a prosecution delays the criminal proceeding, threatens to chill law enforcement by subjecting the prosecutor's motives and decisionmaking to outside inquiry, and may undermine prosecutorial effectiveness by revealing the [prosecutor's] enforcement policy. All these are substantial concerns that make the courts properly hesitant to examine the decision whether to prosecute.

*Wayte v. United States*, 470 U.S. 598, 607–08, 105 S. Ct. 1524, 1530–31, 84 L. Ed. 2d 547 (1985) (quoted, in part, in *Armstrong*, 517 U.S. at 465, 116 S. Ct. at 1486). *United States v. Armstrong* addresses both the risk and the harms.

*Armstrong* identifies the bulwark that prevents Judicial Branch encroachment upon the core powers that are the special province of Executive Branch prosecutors when it says "'[t]he presumption of regularity supports' their prosecutorial decisions and, 'in the absence of clear evidence to the contrary, courts presume that they have properly discharged their official duties.'" *Armstrong*, 517 U.S. at 464, 116 S. Ct. at 1486 (quoting *United States v. Chemical Foundation, Inc.,* 272 U.S. 1, 14–15, 47 S. Ct. 1, 6, 71 L. Ed. 131 (1926)). Kentucky abides by the same presumption. *St. Clair v. Commonwealth*, 140 S.W.3d 510, 531 (Ky. 2004). "[T]he decision whether or not to prosecute, and

what charge to file or bring before a grand jury, generally rests entirely in [the prosecutor's] discretion." *Armstrong*, 517 U.S. at 464, 116 S. Ct. at 1486 (citation omitted).

"Of course, a prosecutor's discretion is subject to constitutional constraints . . . [such as] the equal protection component of the Due Process Clause of the Fifth Amendment . . . ." *Id.* However, it is the defendant who bears the burden to "dispel the presumption that a prosecutor has not violated equal protection[.]" *Id.* at 465, 116 S. Ct. at 1486. *Armstrong* articulates a procedure that "adequately balances the [Executive Branch prosecutor's] interest in vigorous prosecution and the defendant's interest in avoiding selective prosecution" of the kind prohibited by the Due Process Clause. *Id*. at 470, 116 S. Ct. at 1489.

In at least one way, a selective-prosecution claim is reminiscent of the grand jury prosecutorial misconduct claim just discussed. Neither claim can proceed before a threshold showing by the defendant, sufficiently persuasive to the trial court, to authorize a look at otherwise inaccessible evidence. In the prosecutorial misconduct claim, such evidence is what occurred before the grand jury. In the selective-prosecution claim, it is the prosecutor's work product. *Id*. at 463, 116 S. Ct. at 1485.

The Supreme Court deferred discussing Armstrong's "fail[ure] to satisfy the *threshold* showing" to discover work product. *Id.* at 458, 116 S. Ct. at

1483 (emphasis added). Instead, it began by addressing the high substantive bar to the claim itself, starting with the claim's very nature. We do likewise.

"A selective-prosecution claim is not a defense on the merits to the criminal charge itself, but an independent assertion that the prosecutor has brought the charge for reasons forbidden by the Constitution." *Id.* at 463–64, 116 S. Ct. at 1486. Here, the burden of production of evidence and of proof is on the defendant. "The claimant must demonstrate that the . . . prosecutorial policy had a discriminatory effect and that it was motivated by a discriminatory purpose." *Id*. at 465, 116 S. Ct. at 1487 (internal quotation marks and citation omitted).

"To establish a discriminatory effect in a race case, the claimant must show that similarly situated individuals of a different race were not prosecuted." *Id.* It is not enough that a prosecutor charged a defendant of a different race differently. The similarly situated comparator or comparators must not have been prosecuted at all.

There is good reason for this "absolute requirement that there be a showing of failure to prosecute similarly situated individuals." *Id.* at 467, 116 S. Ct. at 1487. The factors that distinguish prosecutorial decision making in one case versus another are as varied as the facts of the charged crimes themselves. "Such factors as the strength of the case, the prosecution's general deterrence value, the [prosecutor's] enforcement priorities, and the case's relationship to [its] overall

enforcement plan are not readily susceptible to the kind of analysis the courts are competent to undertake." *Id*. at 465, 116 S. Ct. at 1486 (quoting *Wayte*, 470 U.S. at 607, 105 S. Ct. at 1530).

The trial court in our case misrepresented this absolute standard by quoting a federal circuit court opinion out of context, stating:

> discriminatory intent . . . may be proven by offering a "comparator" who "committed the same basic crime in substantially the same manner as the defendant . . . against whom the evidence was as strong or stronger than that against the defendant," ***yet was prosecuted differently***. *United States v. Smith*, 231 F.3d 800, 810 (11th Cir. 2000); *United States v. Correa-Gomez*, 160 F. Supp. 2d 748, 750 (E.D. Ky. 2001), aff'd, 328 F.3d 297 (6th Cir. 2003).

(TR 216) (emphasis added). The trial court misrepresented the similarly situated comparators in *Smith* and *Correa-Gomez* as having been "prosecuted differently" when, in fact, they were not prosecuted at all.

The defendant in *Smith*, needing to identify similarly situated comparators, "point[ed] to Patsy Rankins and Betty Banks, both of whom are white, as people who were similarly situated *but escaped prosecution*." *Smith*, 231 F.3d at 811 (emphasis added). In *Correa-Gomez*, the district court quoted the same passage from *Smith* before saying, "Mr. Correa-Gomez's case is factually unremarkable when compared to those similarly situated to him . . . non-Hispanic business owners *who have not been charged* with criminal wrongdoing." *Correa-Gomez*, 160 F. Supp. 2d at 752 (emphasis added).

-94-

The misrepresentation of these opinions could only be unintentional if the trial court never read them, or *Armstrong* for that matter. "To establish a discriminatory effect in a race case, the claimant must show that similarly situated individuals of a different race were not prosecuted." *Armstrong*, 517 U.S. at 465, 116 S. Ct. at 1487.

The binary nature of that absolute standard—prosecuting versus not prosecuting—removes the question of discriminatory intention from the realm of surmise and conjecture. A selective-prosecution claim must be based on fact and "[n]o latitude of intention should be indulged in a case like this. There should be certainty to every intent. . . . [Selective prosecution] is a matter of proof, and *no fact should be omitted to make it out completely . . . .*" *Id.* at 466–67, 116 S. Ct. at 1487 (emphasis original) (quoting *Ah Sin v. Wittman*, 198 U.S. 500, 508, 25 S. Ct. 756, 759, 49 L. Ed. 1142 (1905)). Such conclusive or "clear evidence" of a prosecutor's intentions can only be found in the prosecutor's work product. *Id.* at 462–63, 116 S. Ct. at 1485. *See Smith*, 231 F.3d at 808 (Clear evidence has been interpreted as "'clear and convincing' evidence which is the same thing."). The record shows no work product evidence is in this record other than what the prosecutor, with no legal obligation to do so, revealed as described *infra*, none of which even suggested a discriminatory intent.

2. *The required "threshold showing" to a selective-prosecution claim.*

-95-

"Having reviewed the requirements to prove a selective-prosecution claim," the Supreme Court turned to the threshold "showing necessary to obtain discovery in support of such a claim." *Armstrong*, 517 U.S. at 468, 116 S. Ct. at 1488. The problem, as *Armstrong* explains, is that the claim cannot be proved without discovery of the prosecutor's work product. *Id*. at 462–63, 116 S. Ct. at 1485.

Justification for discovery of prosecutor work product must be based on some authority. *Armstrong* tells us authority for discovering the prosecutor's work product cannot be found in Fed. R. Crim. P. 16, the federal rule governing a defendant's right to discover material in the prosecutor's possession. Kentucky's corresponding rule is RCr 7.24. These rules are comparable in all aspects relevant to this case. *See James v. Commonwealth*, 482 S.W.2d 92, 94 n.1 (Ky. 1972) (noting parts of Fed. R. Crim. P 16 and RCr 7.24 are "almost identical"). Both rules allow that "a defendant may examine documents material to his defense, but . . . may not examine [the prosecutor's] work product . . . ." *Armstrong*, 517 U.S. at 463, 116 S. Ct. at 1485. *See LeGrande v. Commonwealth*, 494 S.W.2d 726, 728 (Ky. 1973) (RCr 7.24(2) "expressly excludes work products"); Fed. R. Crim. P. 16(a)(1)(E)(i), (F)(iii).

*Armstrong* created that necessary authority. *United States v. Bass*, 536 U.S. 862, 863, 122 S. Ct. 2389, 2389, 153 L. Ed. 2d 769 (2002). In pursuit of

establishing the threshold showing of discriminatory intent, "some evidence" means "a credible showing" that "similarly situated individuals of a different race were not prosecuted." *Armstrong*, 517 U.S. at 465, 470, 116 S. Ct. at 1487, 1489 (citing *Ah Sin*, 198 U.S. 500, 25 S. Ct. at 756). This threshold showing is not the same as the far more *conclusive* evidence necessary to *prove* the claim of selective prosecution that we discussed above. But the showing still must be enough evidence of the likelihood of an equal protection violation to justify overcoming the rules prohibiting the discovery of work product, Fed. R. Crim. P. 16(a)(1)(E)(i), (F)(iii) and RCr 7.24(2).

To be sure, the Supreme Court also held "that the showing necessary to obtain discovery should itself be a significant barrier to the litigation of insubstantial claims." *Armstrong*, 517 U.S. at 463–64, 116 S. Ct. at 1486 (internal quotation marks and citation omitted). "[T]he threshold showing" necessary to authorize discovery of work product in aid of a claim of selective prosecution is "that the [the prosecutor] declined to prosecute similarly situated suspects of other races." *Id*. at 458, 116 S. Ct. at 1483.

In *Armstrong*, the defendant's threshold showing was comprised primarily of a defense paralegal prepared "'study' listing . . . 24 defendants, their race, whether they were prosecuted for dealing cocaine as well as crack, and the status of each case." *Id*. at 459, 116 S. Ct. at 1483. The Supreme Court concluded

-97-

the defendant's "'study' did not constitute 'some evidence tending to show the existence of the essential elements of' a selective-prosecution claim. [Citation omitted.] The study failed to identify individuals who were not black and could have been prosecuted for the offenses for which respondents were charged, but were not so prosecuted." *Id*. at 470, 116 S. Ct. at 1489. Also failing to satisfy the threshold showing were the defendant's "affidavits, which recounted one attorney's conversation with a drug treatment center employee and the experience of another attorney defending drug prosecutions in state court, recounted hearsay and reported personal conclusions based on anecdotal evidence." *Id*.

If *Armstrong* is not clear enough, the Supreme Court's reversal of the Sixth Circuit opinion in *Bass*, *supra*, surely should be.

3. United States v. Bass *reaffirms* Armstrong.

In response to a federal prosecutor's filing of a death penalty notice in his case, John Bass sought discovery of the government's capital charging practices in anticipation of a selective-prosecution claim. *United States v. Bass*, 266 F.3d 532, 534 (6th Cir. 2001), *cert. granted, decision rev'd*, 536 U.S. 862, 122 S. Ct. 2389, 153 L. Ed. 2d 769 (2002). To satisfy *Armstrong*'s requirements, Bass presented a Department of Justice (DOJ) report, "The Federal Death Penalty System: A Statistical Survey" and other statistical and anecdotal evidence that blacks, relative to whites, are treated disproportionately in charging them with

crimes, in plea bargaining, in sentencing, and in imprisoning them. *Bass*, 266 F.3d at 536–37.

The district court granted Bass's discovery request and, after the prosecutor refused to comply with the order, dismissed the death penalty notice. *Id.* at 534. The Sixth Circuit affirmed but the Supreme Court granted *certiorari* and rendered "a brief *per curiam* opinion that minced no words as to *Armstrong*'s enduring validity[.]" *United States v. Thorpe*, 471 F.3d 652, 663 (6th Cir. 2006) (citing *Bass,* 536 U.S. at 863-64, 122 S. Ct. at 2389). The Supreme Court repeated what it said in *Armstrong*:

> that a defendant who seeks discovery on a claim of selective prosecution must show some evidence of both discriminatory effect and discriminatory intent. We need go no further in the present case than consideration of the evidence supporting discriminatory effect. As to that, *Armstrong* says that the defendant must make a "credible showing" that "similarly situated individuals of a different race were not prosecuted." *Id.*, at 465, 470, 116 S.Ct. 1480. The Sixth Circuit concluded that respondent had made such a showing based on nationwide statistics demonstrating that "[t]he United States charges blacks with a death-eligible offense more than twice as often as it charges whites" and that the United States enters into plea bargains more frequently with whites than it does with blacks. 266 F.3d, at 538-539 (citing U.S. Dept. of Justice, The Federal Death Penalty System: A Statistical Survey (1988-2000), p. 2 (Sept. 12, 2000)). . . . [R]aw statistics regarding overall charges say nothing about charges brought against *similarly situated defendants*. And the statistics regarding plea bargains are even less relevant, since respondent *was* offered a plea bargain but declined it. See Pet. for Cert. 16. Under *Armstrong*, therefore,

-99-

because respondent failed to submit relevant evidence that similarly situated persons were treated differently, he was not entitled to discovery.

The Sixth Circuit's decision is contrary to *Armstrong* and threatens the "performance of a core executive constitutional function." *Armstrong*, *supra*, at 465, 116 S. Ct. 1480. For that reason, we reverse.

*Bass*, 536 U.S. at 863–64, 122 S. Ct. at 2389 (emphasis original).

Why create this significant barrier even to discovering evidence of selective prosecution among the prosecutor's work product? Our own Supreme Court explains why:

"Few subjects are less adapted to judicial review than the exercise by the Executive of his discretion in deciding when and whether to institute criminal proceedings, or what precise charge shall be made, or whether to dismiss a proceeding once brought." *Newman v. United States*, 382 F.2d 479, 480 (D.C. Cir. 1967). Thus, "[a] judge in our system does not have the authority to tell prosecutors which crimes to prosecute or when to prosecute them." *United States v. Giannattasio*, 979 F.2d 98, 100 (7th Cir. 1992). "Courts do not know which charges are best initiated at which time, which allocation of prosecutorial resources is most efficient, or the relative strengths of various cases and charges." *United States v. Miller,* 722 F.2d 562, 565 (9th Cir. 1983) (citations and internal quotes omitted). Thus, we start with the presumption that the party charged with the prosecution of a case is in the best position to evaluate the probability of its success.

The Executive remains the absolute judge of whether a prosecution should be initiated and the first and presumptively the best judge of whether a pending prosecution

-100-

> should be terminated. The exercise of its
> discretion with respect to the termination of
> pending prosecutions should not be judicially
> disturbed *unless clearly contrary to manifest*
> *public interest.*
>
> *United States v. Cowan*, 524 F.2d [504, 513 (5th Circuit
> 1975)] (emphasis added).

*Hoskins v. Maricle*, 150 S.W.3d 1, 20 (Ky. 2004).

The trial court failed to follow *Armstrong*'s narrow procedure, the only pathway to avoid violating the separation of powers doctrine. That violation is clear legal error.

In the next subsection, we address the trial court's "evidence." It is primarily the trial judge's unsubstantiated opinion. And it is precisely the kind of proof *Armstrong* identifies as falling well short of adequate.

4. *Trial court's* sua sponte *threshold "showing" required to pursue its claim of selective prosecution is inadequate even to allow discovery of the prosecutor's work product.*

Even though the Commonwealth had no burden to bear here, it offered the trial court proof that Appellee, like the defendant in *Armstrong*, declined a plea bargain. The offer was seven years' incarceration. The trial court's so-called similarly situated comparator accepted a plea bargain which required "the exact same number of years to serve as [Appellee]—seven." (VR 5/8/23; 10:07:40); *Commonwealth v. Thomas*, No. 2024-CA-0023-MR, *Mot. to Take*

-101-

*Judicial Notice*, Exh. A (Ky. App. Jan. 2, 2025). The trial court made no mention of the prosecutor's evidence and proceeded to offer its own.

The trial court said it had become aware of Department of Public Advocacy statistics, published in 2020 by the Fayette County Commission for Racial Justice and Equality, that in Fayette County "Black or African Americans . . . are charged with serious felonies at a grossly disproportionate rate." (TR 212).

The court further noted that the same Fayette County Commission recommended that the prosecutor "conduct comprehensive research and review programs" confirming its "charging disparities"; however, the trial court had "no information on whether any of these programs have been implemented[,]" and found it "unfortunate[]" that the prosecutor "does not appear to have altered its conduct since those recommendations were made." (TR 213).

This was not merely evidence. The trial court cited the statistical report's summary in the order dismissing the indictment as conclusive and unimpeachable factfinding. But it was not the only evidence the trial court found persuasive, if not conclusive.

The study and anecdotal evidence are of the same kind found inadequate in *Armstrong* and *Bass*, and even in *Smith* which the trial court cited. And, notwithstanding the trial court's misleading change of the Supreme Court's

-102-

standard distinguishing between the defendant and a comparator from "not prosecuted" to "prosecuted differently," the trial court identified no one who was not prosecuted for a similar crime. But the trial court went further still.

In support of its own allegations of selective prosecution, the trial court effectively testified that "in its 15-year tenure on the bench[, it] has noted a clear pattern of disparate charging decisions by the Commonwealth in which white defendants are charged with lesser offenses and given better offers than defendants of color." (TR 223). The court continued testifying that it was aware of "one other case in which a white defendant . . . was charged by the Commonwealth with only Second-Degree Manslaughter" while choosing "to take a black male [Appellee] . . . and charge him with Murder . . . ." (TR 222–23). The trial judge appears unaware of a rule of evidence prohibiting her own testimony. "The judge presiding at the trial may not testify in that trial as a witness. No objection need be made in order to preserve the point." KRE[45] 605.

It is difficult to believe that a trial court aware of this jurisprudence would even imagine it appropriate or permissible to pursue a selective prosecution claim *sua sponte*. In fact, we found *sua sponte* pursuit of that claim unique among all the American jurisprudence we surveyed. Absent any reasonable explanation, it

---

[45] Kentucky Rules of Evidence.

-103-

would appear the trial court embraces an animus of unknown origin toward the Fayette Commonwealth's Attorney.

In conclusion, without the preliminary showing of proof justifying discovery of the prosecutors' work product: (1) "'[t]he presumption of regularity supports' their prosecutorial decisions[,]" (2) no challenge to those decisions was possible, and (3) no selective-prosecution claim could have proceeded. *Armstrong*, 517 U.S. at 464, 116 S. Ct. at 1486. It is the only course that respects the separation of powers.

## D. Trial Court's Receipt and Use of Extrajudicial Evidence Was Structural Error Requiring Recusal.

In addition to creating its own arguments against the Commonwealth, as just discussed, the trial court researched and presented its own evidence to support them, and the dismissal itself. As explained in *Marchese v. Aebersold*, this mandates the trial judge's recusal *sua sponte*. 530 S.W.3d 441, 445–46 (Ky. 2017).

Citing *Alred v. Commonwealth, Judicial Conduct Commission*, 395 S.W.3d 417, 443 (Ky. 2012), our Supreme Court explained:

> The judge in *Alred* conducted an extrajudicial investigation to discover incriminating information about a party in litigation before him. Citing *Bussell v. Commonwealth*, 882 S.W.2d 111, 112 (Ky. 1994), we commented upon the impropriety of considering "potentially incriminating information about [a party in litigation] from extrajudicial sources." We said: "Recusal

-104-

is appropriate only when the information is obtained [by the judge] from an extrajudicial source." We further explained: "*Because Judge Alred gathered information about the impending matters from extrajudicial sources, he was required to recuse when those cases came before him as judge.*" 395 S.W.3d at 443 n.92. (Emphasis added.)

*Marchese*, 530 S.W.3d at 445–46. In *Alred*, the adversely affected party was the defendant; in this case, that party is the Commonwealth which is no less entitled to the same protections against such improper judicial conduct. The trial judge effectively admitted in her order dismissing that she had researched the question of the cause of Appellee's mental illness, researched the independent grand jury proceedings, and researched the history of the prosecutor's charging decisions, all of which she did independently and extrajudicially.

In *Marchese*, our Supreme Court cited the Supreme Court of the United States, as follows:

[A] judge's critical, disapproving, or even hostile comments directed to a litigant [we would add, "including the Commonwealth"] . . . "ordinarily do not support a bias or partiality challenge" to disqualify the judge, but . . . they *will* do so if they reveal such a high degree of favoritism or antagonism as to make fair judgment impossible." *Liteky v. United States*, 510 U.S. 540, 555, 114 S. Ct. 1147, 127 L. Ed. 2d 474 (1994) (emphasis in original).

*Marchese*, 530 S.W.3d at 446. In our opinion, the trial court did exceed that high degree of antagonism toward the prosecutor, making a fair trial impossible. *Id.*

One should not presume judicial notice concepts will vindicate the trial court. "[J]udicial notice is a rule of convenience that . . . bypasses some of the fundamental requirements for verification and authenticity that otherwise safeguard the integrity of evidence." *Id*. at 447. That is why there is "a high standard for admitting evidence by judicial notice . . . ." *Id.* None of the "evidence" upon which the trial court based its finding of selective prosecution meets that high standard. The statistics and reportage the trial court conveyed were not presented in documentary form or offered into evidence by either party to be challenged by the other. Where the court obtained its personal knowledge of these statistics is unknown but, because it was not received by the trial court in the course of the parties' presentation of evidence, the source is necessarily extrajudicial. The evidentiary value of those statistics was limited to the trial court's memory and recitation.

Similarly, the trial judge clearly was persuaded by her own testimony of her 15-year tenure on the bench spent observing the prosecutor. That recitation in the order amounted to an inadmissible brand of judicial testimony, unsworn, untested by cross-examination, and in violation of the best evidence rule.

> While it may be that the trial judge had [knowledge from prior personal experience], such information does not constitute evidence, nor would the judge be authorized to act upon such information as constituting a fact within his judicial knowledge. 'It matters not what is known to the judge if it is not known to him judicially,' is a maxim of

-106-

the doctrine of judicial notice. We have also held that the court must act upon evidence heard in open court and cannot make a private investigation of a matter pending before the court and then base his decision upon information obtained thereby. To hold otherwise would destroy the very purpose for which our courts are established.

*Commonwealth v. Howlett*, 328 S.W.3d 191, 192 (Ky. 2010) (citations omitted) (quoting *Gray v. Commonwealth*, 264 S.W.2d 69, 70–71 (Ky. 1954)). *See also* KRE 605.

It is difficult to imagine that this trial judge is capable of an unbiased adjudication of the Commonwealth's prosecution of Appellee. *Sua sponte* recusal appears the only reasonable and appropriate solution.

## <u>CONCLUSION</u>

For the reasons set forth above, we VACATE the order dismissing the indictment, REINSTATE the indictment against Appellee, and REMAND the case to the Fayette Circuit Court for further proceedings consistent with this Opinion.

ALL CONCUR.

BRIEFS FOR APPELLANT:

Russell Coleman
Attorney General of Kentucky

Christopher Henry
Assistant Attorney General
Frankfort, Kentucky

BRIEF FOR APPELLEE:

Timothy G. Arnold
Department of Public Advocacy
Frankfort, Kentucky